Laddie RHODES, Jane Fussell, Nancy Harrison, Emily Rhodes, Plaintiffs,

v.

COUNTY OF DARLINGTON, SOUTH CAROLINA, Defendant.

Civ. A. No. 4:91–0179–21.

United States District Court, D. South Carolina, Florence Division.

Aug. 24, 1992.

1166

James William Potter, Richard Michael Smith, John Charles Ormond, Jr., Columbia, SC, for plaintiffs.

Paul A. Dominick, Charleston, Leon Carroll Harmon, David A. Savage, Columbia, SC, for defendant.

## ORDER

TRAXLER, District Judge.

### I. *INTRODUCTION*

In this suit, the Plaintiffs prosecute a variety of state and federal causes of action. The federal jurisdiction is premised upon an issue of federal statutory law, and the state claims are in this court by virtue of pendant jurisdiction. The federal statute at issue is the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9657 (1988). Specifically, the Complainants claim that they are entitled to recover, pursuant to CERCLA, certain costs incurred because of the Defendant's allegedly improper waste disposal management at its landfill facility. Complimentary to the CERCLA cause of action for damages, the Plaintiffs also pray for a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 (1988). The Plaintiffs seek a declaration from this court delineating the duties and obligations of the Defendant arising from the alleged contamination of the landfill. The remaining causes of action, which present issues of pure state law, are the common law claims of negligence, strict liability for hazardous activity, nuisance, trespass, and inverse condemnation. This action presents a case of first impression in this District.[1]

Pursuant to Fed.R.Civ.P. 56, the Defendant has moved the court for summary judgment as to all counts of the complaint, with the exception of the claim for physical trespass to Plaintiff Laddie Rhodes' property. The Defendant contends that it is entitled to judgment as a matter of law because there are no genuine issues of material fact. Specifically, the Defendant asserts that the Plaintiffs have failed to plead or satisfy the *prima facie* elements for a cause of action for recovery of costs under CERCLA. After reading the parties' briefs, holding a hearing on the Motion for Summary Judgment, and reviewing the caselaw and the CERCLA statutory scheme, the court **grants** the Defendant's Motion for Summary Judgment as to the federal claims, thereby depriving this court of federal statutory jurisdiction,[2] and

---

1. The Fourth Circuit in *Nurad, Inc. v. William E. Hooper & Sons*, 966 F.2d 837 (4th Cir.1992), recently addressed some definitional issues under CERCLA. *Nurad, Inc.*, however, did not address the larger questions presented by this action. The court is also mindful of *United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir. 1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989), also delivered by the Fourth Circuit. Like *Nurad, Inc.*, *Monsanto Co.* also did not discuss all aspects of a CERCLA action. The main thrust of *Monsanto Co.* was to explain the purpose and broad remedial scheme of the Act.

2. The only basis of federal jurisdiction is CERCLA. The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 (1988), does not serve as an independent basis of subject-matter jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950). Thus, the Plaintiffs declaratory action, if the Plaintiffs do not prevail on the CERCLA claim, likewise fails. Accordingly, federal jurisdiction is premised solely on CERCLA.

dismisses the complaint without prejudice as to the state law causes of action.

## II. THE FACTS

Since 1974, the County of Darlington, South Carolina, has operated a municipal sanitary landfill northeast of the City of Darlington. The County owns the property on which the landfill is operated, and the landfill is lawfully permitted by the South Carolina Department of Health and Environmental Control. Since its inception, the landfill has accepted for disposal only waste generated by households, yard debris, and certain industrial wastes that were specifically and expressly approved by the Department of Health and Environmental Control for disposal at the site.

Pursuant to state regulations, groundwater tests were performed on the landfill site in 1985 and 1986. The results of these tests indicated that the upper aquifer below the downgradient edge of the landfill may possibly be contaminated because of the landfill's operations. (See "Darlington County Landfill Phase I Groundwater Assessment," at 2). The County, therefore, ordered that a Groundwater Quality Assessment Plan (the "Plan") be prepared by Soil and Material Engineers, Incorporated, an environmental consulting firm. This Plan was approved by the Department of Health and Environmental Control. Accordingly, pursuant to the Plan, the County solicited Chas. T. Main, Incorporated ("Main"), another environmental consulting firm, to conduct further investigations on the quality of the groundwater. These subsequent series of tests were conducted in three phases: Phase I, Phase II, and Phase III.

The Plaintiffs are landowners of real property situated to the southeast of the landfill. The property of Plaintiffs Nancy Harrison and Emily Rhodes is partially adjacent to the southern boundary of the landfill. The parcels owned by Plaintiffs Laddie Rhodes and Jane Fussell do not border the site, although they are located in the general vicinity.

### A. Phase I

As provided for under the Plan, a Phase I Groundwater Assessment Test was per-formed on the landfill by Main. The activities encompassed by Phase I were fairly exhaustive and included: (1) soil test boring to a depth of sixty-five feet with soil samples collected and tested at two-and-one-half—foot (2.5') intervals for the first ten (10) feet and thereafter at five-foot (5') intervals. Quantitative analyses were performed on these samples. (2) Ten (10) earth resistivity soundings and an electromagnetic survey of 130 stations were conducted in areas both up- and downgradient of the site. (3) Two (2) surface water samples were collected from streams downgradient of the landfill and were tested for the presence of selected heavy metal, such as lead or chromium, and for pollutant volatile organic compounds, such as halogenated carbons. (4) Drilling, boring, logging, and analysis of the elements or compounds of the landfill subsurface sediment were also conducted. Additionally, geophysical surveys were performed to determine the geologic and hydrologic conditions at the site. Id. at 4–12. The chemical analyses performed on the collected samples were conducted pursuant to Environmental Protection Agency ("EPA") methods. The purpose of Phase I testing was to identify areas of possible contamination, assess any possible impact on the surrounding drinking water supplies, and determine if further testing was desirable or required.

The results of Phase I revealed that the groundwater under the landfill and the property downgradient from the site had been affected by the landfill's operation. Specifically, the tests indicated high conductivity levels—i.e.—that the soil samples contained a greater degree of metals in them than is normally found. Id. at 21. These high conductivity levels indicated possible groundwater contamination because of the presence of heavy metals in the soil samples. This possibly metal-rich soil formed a "conductivity plume," which extended downgradient from the landfill in a southerly direction a maximum of 1200' feet in length and 2200' feet in width. In addition to the conductivity plume, Phase I testing also indicated that chloride, fluoride, arsenic, and selenium might be present in the groundwater. The ultimate conclusion of Phase I was that further, more-

detailed testing needed to be performed on the groundwater surrounding the landfill. Thus, Phase II was implemented, which provided that groundwater sampling and chemical analysis of the samples be conducted. *Id.* at 21–27.

### B. *Phase II*

Pursuant to the recommendations of Phase I, Phase II testing was instituted by Main at the County's direction. The main thrust of Phase II testing was the installation of six (6) permanent monitoring wells, later increased to nine (9) permanent and four (4) temporary wells, established downgradient from the landfill. (*See* "Phase II Monitoring Well Locations," at 15). These monitoring wells were to be located both on and off the landfill site. The off-site wells were placed on the property of Plaintiff Emily Rhodes, with her approval, and on other property not the subject of this suit. Like Phase I, Phase II also called for a variety of chemical qualitative and quantitative analyses to be performed on the samples taken from the wells and surrounding environs. The most salient experiments to be conducted involved soil testing and groundwater analysis. The soil testing experiments provided for soil permeability tests, sieve analysis, specific gravity, moisture content, unit weight, void ratio, and porosity determinations. The groundwater analysis contemplated detecting various elements and compounds from the samples collected from the wells, namely arsenic, barium, cadmium, chromium, lead, mercury, selenium, silver, nickel, zinc, chloride, fluoride, nitrate, sulfate, volatile organics (carbon-based compounds), and the pH (acidity or basicity) of the water. (*See* "Darlington County Landfill Phase I Groundwater Assessment," at 25). This battery of tests was to be conducted in compliance with methods and procedures approved by the Department of Health and Environmental Control.

The test results of Phase II indicated that neither arsenic, cadmium, chromium, nor selenium were present in the groundwater under the landfill, nor in the groundwater on the Plaintiffs' property. Lead, however, was detected at its detection limit in twelve (12) of the monitoring wells. In addition to lead, nitrates, sulfates, and chlorides were also detected in the groundwater samples. Nitrate was detected in each well sampled with the exception of two (2). The levels of nitrate, however, were below the state drinking water standards for consumption and therefore posed no threat to health or safety. As with nitrates, sulfates were detected in all but two (2) of the wells. The study concluded, however, that the concentration of sulfates, like that of the nitrates, was far below the state drinking water standards. Moreover, the analysis noted that the sulfates found were probably the result of naturally occurring sulfate levels in groundwater and that even the higher levels of concentration, which complied with state safety standards, should not be a major concern. Chlorides were also detected in the well. The analysis concluded that the concentration levels of chloride detected indicated a great disparity, from three (3) milligrams per liter to 900 milligrams per liter. The state standard for chloride in drinking water is 250 milligrams per liter. Accordingly, some of the concentration levels of chloride exceeded the safety limit. (*See* "Phase II Analytical Results and Interpretation," at 24–28).

The Phase II testing also determined that certain volatile organic compounds ("VOC") were detected in one (1) of the four (4) wells located on Plaintiff Emily Rhodes' property. *Id.* at 26–28. The analysis further concluded, however, that the presence of VOC was restricted to certain portions of the site, was not widespread but confined to the upper portions of the upper clay layer of the soil and the sand aquifer, and appeared in relatively low concentrations. *Id.* at 27. Phase II analysis also concluded that VOC contamination was limited to the groundwater underlying the landfill and that the primary element of the plume was chloride. Chloride, like sulfate, is a naturally occurring element that may also possibly affect the downgradient water quality. Chloride, however, is a "Secondary Drinking Water Parameter." Such secondary parameters affect the aesthetic qualities of water, not the quantitative level or type of toxic elements or compounds found in the groundwater. *Id.* at 25. As to the downgradient impact of the water at the site, Phase II determined that contamination

was minimal. Significantly, while Phase II ultimately recommended that more testing and analysis of the site be conducted in a Phase III study, the results of Phase II determined that since chloride, a secondary parameter, was the prime constituent of the plume, because the VOC were localized to the landfill area, and that because the downgradient impact was minor, no remediation was recommended. *Id.* at 29–30.

## C. *Phase III*

Pursuant to Main's Phase II recommendation for more testing, the County authorized a Phase III investigation of the site. The purpose of Phase III was to determine the precise dimensions of the plume and to anticipate its movement. To this end, Phase III contemplated the following: (1) performing geophysical conductivity surveys performed in the areas downgradient of the site; (2) because lead was detected in some of the wells, a resampling of the well water, using more sensitive analysis, to determine the lead content; (3) the installation of additional groundwater monitoring wells placed downgradient of the landfill. The new well locations were situated directly downgradient from the existing wells showing traces of toxic compounds. Along with the new wells, the water from the existing wells was to be resampled and reanalyzed; (4) monitoring off-site wells for the presence of chloride, lead, and VOC. Accordingly, Phase III was duly executed by Main. *Id.* at 29. (*See also* "Phase III Groundwater Monitoring Wells," at 6).

The results of Phase III revealed that: (1) cadmium was not detected in the groundwater above any permissible limits; (2) lead was found in wells both on and off the site, but its level was below the state's maximum contamination level for lead; (3) trace amounts of VOC were found both on and off the site; however, there are no state, or federal standards regulating the permissible levels for VOC, with the exception of benzene, 1, 4 dichlorobenzene, and vinyl chloride. Benzene was not detected in the lower sand layer and no distinguishing differences were noted between the clay layer and the upper sand. The study, however, recommended further

monitoring of the groundwater; (4) the chloride concentrations of the landfill continued to increase. While the lower sand unit did not exceed state standards for the presence of chloride, both the upper clay and sand units exceeded the state's parameters for chloride in drinking water. (*See* "Phase III Groundwater Monitoring Wells," at 11). The study finally concluded that remediation of the groundwater either on or off the landfill site was not necessary. *Id.* at 12.

Based on the results of Phase III, Main recommended further investigation of the site, which included: (1) monitoring the former and newer wells for the presence of VOC and chloride; (2) capping the landfill with an impermeable layer of clay and/or synthetic materials to foreclose leaching of any contaminants into the groundwater. Capping the site would dilute the chlorides as they permeate the aquifer, thereby rendering remediation of the landfill nugatory; (3) installing three (3) additional monitoring wells at a deeper level in the sand unit and analyzing water samples collected from these wells for the presence of chlorides. *Id.*

## D. *The Plaintiffs' Report*

In their surreply, but not in their Motion Opposing the Defendant's Motion for Partial Summary Judgment, the Plaintiffs submitted a report prepared by Environmental Technology Engineering, Incorporated, another environmental consulting firm. This report concluded that the concentration of benzene and chloride in monitoring well 7A exceeded EPA and South Carolina state standards for drinking water. The report similarly concluded that vinyl chloride, ethylbenzene, toluene, chlorobenzene, and lead were below their recommended maximum concentration levels. Based on these findings, the report concluded that "[t]he range of pH values detected in [well 7A] does not necessarily represent a contamination problem. However, the dramatic increase in the specific conductance following purging of the monitoring well may represent the presence of contamination in the well." (*See* "Environmental Technology Engineering Findings," at 3). The report also stated that the concentra-

tions of chloride and benzene "may represent the leading edge of a leachate plume." *Id.*

### E. *The Plaintiffs' Property*

Plaintiff Laddie Rhodes' parcel is used for growing various crops and Christmas trees. Fixtures on the property include two (2) unhabitable houses, a trailer, and two (2) barns. Mr. Rhodes has never attempted to mortgage or sell his property. Significantly, only one drinking well is located on the property; and Mr. Rhodes has not had the water from this well tested since 1986. (*See* "Deposition of Laddie Rhodes," at 12–20).

Plaintiff Jane Fussell lives on her property, which is not adjacent to the landfill. Ms. Fussell's water is supplied by the county system, and her property has no surface water. There are, however, wells on Ms. Fussell's property that are used primarily for farming purposes and for watering the yard. Additionally, there are two (2) underground storage tanks on the parcel that are used for storing petroleum products. While Ms. Fussell has never mortgaged or attempted to sell her property, she has leased it to a farmer for the approaching season. Approximately 100 acres are under cultivation. Significantly, Ms. Fussell has never placed monitoring wells on her parcel, nor has she any plans to do so. (*See* "Deposition of Jane Fussell," at 32–33). Ms. Fussell also represented to the lessee of her property that the water on the parcel was available for use. *Id.* at 49. Moreover, Ms. Fussell expressly stated in her deposition that she had no qualms about using the water. (*See id.,* "I don't know of any concerns at this time about using it [the water]. I don't think there were any."). Finally, one of the wells on Ms. Fussell's parcel was tested by the Department of Health and Environmental Control in 1986; and no problems were observed. Ms. Fussell sought treatment for her well, not based on any personal knowledge or observation concerning the quality of her water, but because there had been an article in the local newspaper concerning the landfill. *Id.* at 53.

All of Plaintiff Nancy Harrison's property, which is leased to others for farming, is under cultivation. (*See* "Deposition of Nancy Harrison," at 11, 18–22). This parcel is partially adjacent to the southern boundary of the landfill. Neither Ms. Harrison nor her lessees reside on the parcel, and the only structures located on it are an unused tenant house and a barn. *Id.* at 14–15. Indeed, Plaintiff Harrison appears to have little contact with her parcel because she visits it only four (4) times per year. *Id.* at 23. Ms. Harrison has never attempted to sell or change the use of her property. *Id.* at 22, 24. Prior to this litigation, the County had never placed a monitoring well on the property; and Ms. Harrison stated that she was not aware of any surface trespass by the landfill. *Id.* at 26–27. Ms. Harrison has never had the water from the groundwater well tested. Currently, however, as a result of the filing of this action, Ms. Harrison recently installed a single groundwater monitoring well. *Id.*

Like Ms. Harrison's tract, Plaintiff Emily Rhodes' parcel is contiguous with the southern boundary of the landfill. (*See* "Deposition of Nancy Rhodes," at 11–12). Of the 170 acres of land, approximately 100 acres are leased as farmland and are currently under cultivation; the remaining seventy-one (71) acres are undeveloped. *Id.* at 26–29. Although no one resides on Ms. Rhodes' property, there are various structures, such as a tool shed, a barn, and five (5) tenant houses. *Id.* at 21–22. On this tract, there is one drinking-water well, which has not been tested, and three (3) other monitoring wells installed by the County with Ms. Rhodes' permission. *Id.* at 51, 56. Like the other Plaintiffs, Ms. Rhodes has not attempted to mortgage her property; but she placed the parcel on the market for sale through a real estate firm. *Id.* at 21, 28–31. Unsatisfied with the offers she received and attributing these lower offers to the proximity of her parcel to the allegedly contaminated landfill, Ms. Rhodes withdrew her property from the market. *Id.* at 36–38. A private appraisal at the Plaintiffs' behest by Douglas Brown concluded that the total of all tracts owned by the Plaintiffs had collectively diminished in value by $235,000.00. *Id.* at 36. The Plaintiffs ascribe this diminished value to their lack of ability to procure financing on the allegedly contaminated property and the resulting

stigma of holding allegedly contaminated property. Subsequently, the Plaintiffs instituted this action against the County.

As previously stated, the County operates the landfill with the Department of Health and Environmental Control's permission. Furthermore, the Department of Health and Environmental Control inspects the site on a regular basis, although Plaintiffs allege that the landfill has violated provisions of the permit. Specifically, the Plaintiffs claim that the County has failed to provide adequate cover for the landfill, as noted in site inspection reports. The reports, however, merely state, not that the County had violated the terms of its permit, but that certain aspects of the site needed improvement. (*See* "South Carolina Department of Health and Environmental Control Bureau of Solid & Hazardous Waste Management Solid Waste Disposal Site Inspection Sheet"). The County has never claimed the contrary, but has consistently asserted that no wastes have been deposited in the landfill which have not been specifically approved by the Department of Health Control; and the Plaintiffs do not contest this assertion. In order to maintain further regulation and control over the landfill, the County, through its Administrator, has appointed a manager to the site.

### F. The Plaintiffs' Alleged Response Costs

The Plaintiffs' have provided minimal explanation as to exactly what necessary response costs they have incurred. Their suit papers do nothing more than vaguely allege that the Plaintiffs have incurred response costs. The following excerpts reveal the Plaintiffs' alleged response costs: "The Plaintiffs have incurred response costs such as investigative and testing expenses in addition to costs related to enforcement." ("Plaintiffs' Memorandum In Opposition To The Defendant's Motion For Summary Judgment," at 6). "The Plaintiffs have incurred preliminary investigative and enforcement costs due to this contamination." *Id.* at 7. "The Rhodes family has simply begun conducting the necessary preliminary investigations, sampling and testing measures . . . ." *Id.* "The Plaintiffs have taken the necessary preliminary steps in defining the scope and

extent of contamination at the landfill and on their property." *Id.* at 8. Even in their surreply, the Plaintiffs fail to state, and certainly with no specificity, what their response costs are, other than that the Plaintiffs allege that their costs are investigative: "The Plaintiffs have incurred the following costs: 1. Costs associated with the investigation of data and documentation on the nature, extent and scope of the contamination upgradient of the Plaintiffs' property. 2. Consulting and geological fees incurred associated with the testing and analytical documentation of groundwater on the Plaintiffs' property. 3. Attorneys fees incurred in the enforcement of Section 107 action." ("Surreply To Defendant's Motion for Partial Summary Judgment," 7–8). The Plaintiffs have simply not stated what actual costs they have incurred nor what activity is encompassed under their investigative expenses. Equally, the Plaintiffs claim diminution in the collective value of their land by $235,000.00, lack of ability to procure suitable financing, and the stigma of owing allegedly contaminated property. As discussed below, alleged diminution in the value of land, inability to secure financing, and any putative stigma of possessing allegedly contaminated property are not necessary response costs and therefore not recoverable under CERCLA.

Stripped to its essentials, this action presents a single federal claim prosecuted under CERCLA—a detailed, comprehensive, narrow, and specific Act that applies only under limited circumstances and only when five (5) specific elements have been procedurally and substantively satisfied. The gravamen of the Plaintiffs' Amended Complaint are state-law claims—claims best left to the state tribunals. The court is compelled to conclude that the Plaintiffs are attempting to invoke federal jurisdiction by asserting what are essentially state-law claims under the guise of CERCLA. CERCLA is not such a substitute action and may not be used as a mere medium for invoking the jurisdiction of the federal courts.

### III. DISCUSSION

#### A. Legislative History of CERCLA

In the wake of "Love Canal," the Ninety-sixth Congress in the waning days of 1980

enacted the Comprehensive Environmental Response, Compensation, and Liability Act, Pub.L. No. 96–510, 94 Stat. 2767 (1980), codified at 42 U.S.C. §§ 9601–9657 (1988). Few statutes have had a less propitious origin than the beleaguered CERCLA legislation. The Act that emerged as CERCLA was the result of compromise. Indeed, CERCLA in its original form was the precipitate of three major hazardous substance response bills originating in Congress and one from the Carter Administration, S. 1341, which died in Committee.

The first of the three bills, H.R. 85, 96th Cong., 1st Sess., (1979), was introduced by Representative Biaggi on January 15, 1979. *See* H.R.Rep. No. 96–172(I), 96th Cong., 1st Sess., *reprinted in* 1980 U.S.C.C.A.N. 6160, 1980 U.S.C.C.A.N. 6212 (1979); *see also* 1980 U.S.C.C.A.N. 6228 (related report). After consideration by the reporting committee, the bill was introduced to the full House, where it immediately encountered opposition from the chemical and oil industry lobby. *See* H.R.Rep. No. 96–172(I), 96th Cong., 1st Sess., 1979, *reprinted in* 1980 U.S.C.C.A.N. 6160; *see also* H.R.Rep. No. 96–1016, 96th Cong., 1st Sess., 1979 *reprinted in* 1980 U.S.C.C.A.N. 6119, 6207 (discussing bill history). Far from admitting defeat, however, Representative Breaux introduced a substitute bill as an amendment to H.R. 85, which had as its purpose the clean up of national waterways. *See* 126 Cong.Rec. 26391. This new bill established two funds financed from taxes on petroleum and chemical feedstocks. One of these funds provided for compensation for oil spills, while the other provided for the regulation and clean up of toxic chemical spills in navigable waters. *Id.* Moreover, the bill provided for strict liability to be imposed on the operators of vessels laden with hazardous materials. *Id.* Conspicuously, however, H.R. 85 did not address the issue of hazardous substances released on land. The bill, therefore, was more circumscribed and limited in scope and purpose than the present CERCLA statute. Like CERCLA's compensation scheme, H.R. 85 did provide for the Government and private parties to recover damages for cleanup costs and certain economic injuries. While H.R. 85 survived Committee and was ultimately considered and passed by the House, the bill was tabled for further consideration pending the next legislative session.

The second of CERCLA's progenitors was H.R. 7020, 96th Cong., 2d Sess., (1980), introduced by Representative Florio on April 2, 1980. This bill created a trust which would receive its funds not only from a tax on oil and chemicals, but also on general revenues. *See* H.R.Rep. No. 96–1016 (1980), 126 Cong. Rec. 26799 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6120–24. Thus, H.R. 7020 provided for financing by the Government at large in addition to the taxes it imposed on the hazardous substance industry. The purpose of this trust fund was to finance Government actions in response to releases of toxic substances from inactive hazardous waste sites. *Id.* In direct contravention to H.R. 85, H.R. 7020 expressly did not provide for spills on water ways, nor did compensation for economic injury fall within the bill's ambit. Like H.R. 85, H.R. 7020 was reported out of Committee and enacted by the House. *Id.* This bill, H.R. 7020, was attacked as being too limited in scope and providing insufficient remedies for aggrieved parties. Ultimately, however, H.R. 7020, as amended by the Senate, developed into CERCLA.

The third and final of CERCLA's progenitors was S. 1480, 96th Cong., 1st Sess., (1979). This bill was introduced by Senators Culver, Muskie, Stafford, Chafee, Randolph, and Moynihan. Like H.R. 7020, S. 1480 provided for a broad revenue base: a $4 billion trust fund financed by general revenues in addition to particular taxes imposed on the chemical and oil industry. *See* S.Rep. No. 96–848 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119. The Senate bill contemplated strict liability for owners and operators of hazardous waste sites and was not restricted to spills or releases on land or water. The bill did expressly except oil spills, however. *Id.* In addition to Governmental and private recovery for cleanup costs, the bill provided for numerous consequential damages, such as medical and medical surveillance expenses and health assessment costs. *Id.*

Senate bill 1480 was attacked as too sweeping in its rights and remedies and met opposition on the floor of the Senate. The Senate, therefore, considered two compromise bills intended to strengthen the earlier House bills while diminishing the recoverable costs for personal injury and economic loss available under the Senate bill. *See* 126 Cong.Rec. 30935 (1980). The second of these bills, which merely amended H.R. 7020 to conform to the Senate version, became CERCLA. Thus, H.R. 7020, as amended, was eventually enacted. Interestingly, the bill retained the House file number, even though the Senate version was the one enacted. This anomaly is apparently explained by the fact that appropriations bills must originate in the House. Given its inception, CERCLA's legislative history is far from illuminating because of the eleventh-hour, unexplained compromises that resulted from the blending of three separate bills. Also, there is not even a committee report on the final version of the Act. Accordingly, the legislative history, to the extent any exists, is of little value in interpreting the statute because the final version of the act reflected Congressional opinions which differed markedly from those incorporated in either the House or Senate bills.

CERCLA is oft-criticized for its hasty passage and lack of clarity. There is virtually no legislative history to guide the courts in interpreting the Act. The statute as originally enacted was, at best, vague and indefinite. The courts have echoed their frustration with the act:

> Because CERCLA as finally enacted was the product of an unusually arduous process of political compromise, it is hardly a model of concise legislative draftsmanship.
>
> . . . .
>
> CERCLA is not a paradigm of clarity or precision. It has been criticized frequently

for inartful drafting and numerous ambiguities attributable to its precipitous passage. Problems of interpretation have arisen from the Act's use of inadequately defined terms, a difficulty particularly apparent in the response costs area.

*Artesian Water Co. v. Government of New Castle County,* 659 F.Supp 1269, 1277 (D.Del. 1987), *aff'd,* 851 F.2d 643, 648 (3d Cir.1988), respectively; *see also Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1572 (5th Cir.1988); *Ambrogi v. Gould, Inc.,* 750 F.Supp. 1233, 1239 (M.D.Pa. 1990); *Lutz v. Chromatex, Inc.,* 718 F.Supp. 413, 416 (M.D.Pa.1989); *United States v. Mottolo,* 605 F.Supp. 898, 902, 905 (D.N.H. 1985); and *Bulk Distribution Centers, Inc. v. Monsanto Co.,* 589 F.Supp. 1437, 1441 (S.D.Fla.1984) (criticizing the statute's legislative history as "riddled with uncertainty" and enjoying a "well-deserved notoriety").[3] In response to CERCLA's unwelcome reception, Congress, in 1986, amended the Act by the Superfund Amendments and Reauthorization Act ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613, finally codified at 42 U.S.C. § 9601–9657 (1988).[4] The main thrust of SARA was to define terms and clarify issues not addressed in the 1980 CERCLA legislation.

Although CERCLA is far from being a model of clarity, the purpose of the Act is clear—Congress desired a comprehensive plan to remedy hazardous waste facilities:

> [T]he need for an emergency Federal response to deal with abandoned waste sites and chemical spills is real, and it is immediate.
>
> . . . .
>
> We have no time to lose. Hazardous wastes are produced daily; we cannot put them on hold while we dally through deliberation. . . . I believe the clear consensus

---

**3.** In addition to the courts, commentators have also expressed chagrin at the confused legislative history of CERCLA. *See* Grad, *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability ("Superfund") Act of 1980,* 8 Colum.J.Envtl.L. 1 (1982); Eckhardt, *The Unfinished Business of Hazardous Waste Control,* 33 Baylor L.Rev. 253 (1981); Note, *Liability for Generators of Hazardous*

*Waste: The Failure of Existing Enforcement Mechanisms,* 69 Geo.L.J. 1047 (1981).

**4.** For purposes of clarity, this opinion refers to CERCLA as encompassing the SARA amendments and refers to 42 U.S.C. §§ 9601–9657 (1988), as amended, as "CERCLA."

is that we must clean up abandoned hazardous dump sites as soon as possible. Cong.Rec. S. 14,973, 14,977 (daily ed. Nov. 24, 1980) (statements of Senators Tsongas and Danforth, respectively). New legislation was needed to address the growing threats to the environment. Indeed, Congress itself explicitly noted that the "existing law is clearly inadequate to deal with this massive problem ... the need for a strong legislative response is evident." H.R.Rep. No. 1016, 96th Cong., 2d Sess., p. 18, *reprinted in* 1980 U.S.C.C.A.N. 6119, 6120. Thus, the impetus for enacting new legislation was the inadequacy of prior legislation, namely the Resource Conservation and Recovery Act (RCRA), *as amended by* Solid Waste Disposal Act Amendments of 1980, Pub.L. No. 96–482, 94 Stat. 2334, *codified at* 42 U.S.C. §§ 6901–6987 (1988), which Congress believed left "important regulatory gaps," in providing for environmental protection. *See* H.R.Rep. 1016, 96th Cong., 2d Sess., p. 22, *reprinted in* 1980 U.S.C.C.A.N. 6119, 6125. The RCRA did not regulate the problem of abandoned waste sites. Rather, RCRA merely authorized the EPA to monitor inactive sites to the extent that they posed an "imminent hazard." Thus, RCRA enjoyed no future application—the injury had to be incurred before triggering the provisions of RCRA. The inefficiency of such legislation, particularly when toxic substances are at issue, is blatantly apparent. Also, one of the most salient shortcomings of RCRA was its inability to allocate liability if the operators of hazardous sites met an exception for shouldering costs or simply could not be located.

■ Responding to this concern, CERCLA authorizes the Government to prosecute actions against other potentially responsible parties, not merely the owners of a waste facility. The Committee Reports stated that "it is the intent of the Committee in this legislation to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." *Id.* at 22, 6125, respectively. CERCLA's primary concerns, therefore, are: (1) providing specific, uniform, Government-mandated plans for aggrieved parties to cleanup toxic sites; and (2) for conspicuous, anticipated expense schemes to provide notice to the liable parties to finance such cleanup. With these purposes in mind, the court now addresses the issue of shouldering these costs.

In addition to CERCLA's general purpose of environmental cleanup, Congress clearly provided that the chemical industry should bear the burden of financing cleanup activity. The EPA, the administrative agency charged with implementing and administering CERCLA, stated that

> [S]ociety should not bear the cost of protecting the public from hazards produced in the past by a generator, transporter, consumer, or dump site owner-operator who has profited or otherwise benefited from commerce involving these substances and now wishes to be insulated from any continuing responsibilities for the present hazards to society that have been created.... [R]elieving industry of responsibility establishes a precedent seriously adverse to the public interest....

S.Rep. No. 848, 96th Cong., 2d Sess. 98 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119. Moreover, Senator Chafee, who co-sponsored S. 1480, stated that "Governments must have a tool for holding liable those who are responsible for those costs." Cong.Rec. S. 15,-003 (daily ed. Nov. 24, 1980). The courts have likewise interpreted as placing, wherever possible, the financial burden of cleanup on the party creating the hazardous condition. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986), *clarified by In re Dedham Water Co.*, 901 F.2d 3 (1st Cir.1990); *Lone Pine Steering Comm. v. Environmental Protection Agency*, 777 F.2d 882, 886 (3d Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1276 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir.1988). The court in *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135, 1142–43 (E.D.Pa.1982), aptly summarized the Act as follows:

> [CERCLA] is designed to achieve one key objective—to facilitate the prompt cleanup of hazardous dump sites by providing a

means of financing both Governmental and private response and by placing the ultimate financial burden upon those responsible for the danger. The liability provision is an integral part of the statute's method of achieving this goal for it gives a private party the right to recover its response costs from responsible third parties....

Thus, while CERCLA suffers from a checkered past, the general purposes of the Act remain relatively clear.

### B. The Substantive Provisions of CERCLA

■ CERCLA imposes an excise tax on petroleum, petroleum by-products, and various chemicals, the purpose of which is to supply funds for a trust, the Hazardous Substance Response Trust Fund,[5] commonly referred to as "Superfund."[6] See 42 U.S.C. §§ 9631–9641 (1982).[7] Superfund monies are used to clean up releases of hazardous substances and to prevent future releases of toxic substances into the environment.[8] The primary goals behind the trust fund are twofold: (1) to finance "Government responses" to hazardous waste facilities, which consist of either "removal" or "remedial" actions; and (2) to pay "claims," which are demands for reimbursement made on the trust fund. See 42 U.S.C. § 9601(23), (24). These claims may be demanded by either private parties, provided such costs are incurred in compliance with the National Contingency Plan, or by the state and federal Governments for compensation for injury to natural resources belonging to the sovereign. See 42 U.S.C. § 9611(a)(2), (3). Additionally, the Act establishes strict liability for responsible parties, see 42 U.S.C. § 9607(a), and establishes

certain defenses, see 42 U.S.C. § 9607(b). Superfund, therefore, covers cleanup costs if the site has been abandoned, if the responsible parties elude detection, or if private resources are inadequate. CERCLA also authorizes judicial action when a substantial, immediate threat or threatened release of hazardous materials poses a danger to the public health or environment. See 42 U.S.C. § 9606. Finally, the Act calls for the creation of a "National Contingency Plan ("NCP")." The NCP[9] requires in part that the President compile a list of waste facilities most in need of federal attention, the "National Priority List." The purpose of the NCP is to reflect and execute the powers enumerated under the Act. See 42 U.S.C. § 9605(8)(B). The NCP also states that the EPA shall be responsible for proposing rules, regulations, and criteria in appropriating Superfund monies. The main thrust of the NCP is to "establish procedures and standards for responding to releases of hazardous substances." 42 U.S.C. § 9605. Finally, in addition to damages, the NCP also calls for equitable remedies—the EPA can petition the district court for an injunction to coerce responsible parties to clean up any site that presents an imminent threat to the general welfare or the environment. See 42 U.S.C. § 9606(a). These are the highlights of CERCLA. The Act also enumerates the elements needed to prevail upon a claim prosecuted pursuant to its terms, the issue to which the court now turns.

### C. The Elements of a CERCLA § 9607 Claim

■ As stated, the statutory scheme of CERCLA reveals that the Act attempts to

---

5. CERCLA actually creates two funds: 42 U.S.C. § 9641 establishes the Post–Closure Liability Trust Fund, which is financed through taxes on hazardous substances disposed of at qualified disposal facilities.

6. Superfund originally provided for $1.6 billion to be used to achieve its goals. At the time CERCLA was enacted, there were literally thousands of waste facilities targeted for clean up. In 1980, various sums were advanced for the total amount of funds needed to effectuate clean up. These figures ranged from $7 billion to $44 billion. See S.Rep. No. 848, 96th Cong., 2d Sess, at 2, reprinted in 1980 U.S.C.C.A.N. 6119.

7. As originally enacted, CERCLA was "sunset" legislation. By the Act's terms, the Federal Gov-

ernment's authority to collect the excise tax and to appropriate general revenues for Superfund expired on September 30, 1985. See 42 U.S.C. §§ 9631(b)(2), 9653.

8. Echoing some of its earlier progenitors, CERCLA does not include oil spills within its definition of hazardous substances. Also, Superfund monies are not used to compensate private parties for economic injuries resulting from the discharge of toxic materials.

9. The NCP is a detailed plan filling many gaps left in the statutory scheme. The NCP is reproduced at 40 C.F.R. §§ 300.1–300.920 (1991).

resolve the dilemma of hazardous substances being released into the environment and the appropriate response to abating and curing such threats. To effectuate these purposes, both the decisional and statutory law have enunciated the elements that a plaintiff must allege and prove to succeed on a private cause of action under 42 U.S.C. § 9607(a)(4)(B) [10]:

 (1) The Plaintiffs must fall within one of the four categories of "covered persons." 42 U.S.C. § 9607(a).

 (2) There must be a release or threatened release of hazardous substances from the waste site. 42 U.S.C. § 9607(a)(4).

 (3) The costs so incurred must be necessary and appropriate costs of response. 42 U.S.C. § 9607(a)(4)(B); 42 U.S.C. § 9601(23)–(25).

 (4) The release or threatened release must have caused the complaining party to incur response costs. 42 U.S.C. § 9607(a)(4).

 (5) The complaining party's response actions must be consistent with the NCP. 42 U.S.C. § 9607(a)(4)(B).

Apart from the statutory law, the caselaw accords with the proposition that these elements satisfy a private action under CERCLA. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1150 (1st Cir.1989), *clarified by In re Dedham Water Co.,* 901 F.2d 3 (1st Cir.1990); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir. 1989); *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152–53 (9th Cir.1989); *Ambrogi v. Gould, Inc.,* 750 F.Supp. 1233, 1239 (M.D.Pa.1990); *Channel Master Satellite v. JFD Elec. Corp.,* 748 F.Supp. 373, 381 (E.D.N.C.1990); *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1278–79 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir.1988). These elements constitute the requirements a private-action CERCLA plaintiff must satisfy in order to prove a *prima facie* case under the Act. These elements will be discussed in turn.

**10.** The requirements of a private cause of action under CERCLA *versus* a Government-prosecuted cause of action under the Act are similar, although not identical. The sovereign need not allege or prove that its costs were properly incurred pursuant to and consistent with the NCP.

### 1. *Covered Persons*

■ Section 9607(a) holds four (4) classes of persons liable for the release or threatened release of hazardous materials:

 (1) [T]he owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,

 (2) [A]ny person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

 (3) [A]ny person who by contract, agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

 (4) [A]ny person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person.

Since 1974, the County has owned and operated the landfill site. Moreover, the site uncontestedly serves as a receptacle for waste disposal. Additionally, the County has specifically accepted industrial wastes at its facility with the permission of the Department of Health and Environmental Control. The very purpose of the facility is to serve as a waste disposal center. The County, by owning and operating the site, clearly falls within the purview of a "covered person" under CERCLA.

■ Furthermore, "facility" is defined by the Act as:

[A]ny building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, *landfill,* ... or *any site*

*See United States v. Ward,* 618 F.Supp. 884, 899 (E.D.N.C.1985). This opinion addresses only the private cause of action when a private party is the plaintiff since the Plaintiffs to this litigation are private individuals.

*or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located. . . .*

42 U.S.C. § 9601(9) (emphasis added). By the express language of the statute, the site in the case at bar satisfies the definition of a "facility." Indeed, a landfill is the very epitome of a "waste disposal facility." The County cannot, and indeed does not, seriously maintain that the landfill is not a facility under CERCLA. The irresistible conclusion, therefore, is that the County satisfies the first criterion under the Act and that the site is a "facility" as defined by the explicit terms of the statute. The court also notes that the decisional law has unfailingly held operators of waste disposal sites to be "covered persons" and landfills to be "facilities" under CERCLA. *See Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. at 1280–81; *United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 185 (W.D.Mo. 1985); *United States v. Ward,* 618 F.Supp. 884, 895 (E.D.N.C.1985). The Plaintiffs in the present action, therefore, have met the first criterion of a private-action CERCLA claim.

### 2. *Release or Threatened Release of Hazardous Substances*

■ Satisfying the first element of their action, the Plaintiffs must now allege and offer evidence that a release or threatened release of a hazardous substance emanated from the landfill. Section 9601(22) defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." Clearly, this definition contemplates a broad, remedial view of how hazardous substances can find their way into the environment without their affirmative discharge by an owner or operator of a facility. Thus, only minimal thresholds are necessary to demonstrate a release. Moreover, the caselaw has liberally construed the term "release." *See Nurad, Inc. v. William E. Hooper & Sons,* 966 F.2d 837 (4th Cir.1992); *New York v. Shore Realty,* 759 F.2d 1032, 1038, 1045 (2d Cir.1985). The purpose of broadly construing the term is "to avoid frustrating the beneficial legislative

purposes." *Dedham Water Co.,* 805 F.2d at 1081. Indeed, a full-fledged release need not be shown to exist. If the complaining party can prove that there is merely a threat of release, then this element of a private action under CERCLA has been satisfied. *See Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 793 (D.N.J. 1989). In addition to demonstrating a release or threatened release, a CERCLA plaintiff must also demonstrate that at least one of the toxic materials is a "hazardous substance" under CERCLA, which defines "hazardous substance" as:

> (A) any substance designated pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Control Act, (B) any element, compound, mixture, solution, or substance designated pursuant to Section 102 of this Act, (C) any hazardous waste having the characteristics identified under or listed pursuant to Section 3001 of the Solid Waste Disposal Act . . . (D) any toxic pollutant listed under Section 307(a) of the Federal Water .Pollution Control Act, (E) any hazardous air pollutant listed under Section 112 of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to Section 7 of the Toxic Substance Control Act. . . .

42 U.S.C. § 9601(14). Additionally, 40 C.F.R. § 302.4 (1991), cites a comprehensive list of elements and compounds that are considered "hazardous substances" under CERCLA. Specifically, benzene, benzene-based compounds, and VOC are "hazardous substances" under the Act.

■ In the case at bar, while chlorides, nitrates, and sulfates were found to exist at varying concentrations, these compounds are not considered "hazardous materials" under either 42 U.S.C. § 9601(14) or 40 C.F.R. § 302.4. Equally, while lead was detected in the monitoring well, its concentration levels were below the state maximum contaminant level. While benzene was detected at the site, the Phase III report concluded that the concentration levels, save for one monitoring well, did not pose a health risk. Plaintiffs' environmental report, however, found that benzene did exist in unsatisfactory concen-

trations. Therefore, construing the allegations in the Plaintiffs' favor, the court assumes that there was a release of hazardous substances. While VOC were found in trace amounts, they formed no identifiable plume, but were localized; moreover, Phase III recommended that no remediation of the groundwater either on or off the site was necessary. A requisite element of a CERCLA action requires that a plaintiff show that hazardous substances were released from the site. *See Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. at 1282. The Plaintiffs have offered evidence that shows a release of benzene, a hazardous substance. *See* 40 C.F.R. § 302.4 (1991).

Phase III also recommended, however, that the groundwater undergo further monitoring to detect any increase in VOC and that additional monitoring wells be installed. Phase III results also dictated that a clay cap be placed over the landfill, which would render any possibility of remediation nugatory. These conclusions and recommendations indicate that there is also a "threat of release" of hazardous substances. Because concentrations of benzene in a single monitoring well were detected at higher levels, the possibility exists that such substances may increase in concentration. The mere threat of release is sufficient under CERCLA. *See Amland Properties Corp.,* 711 F.Supp. at 793. Given the discovery of the substances found through testing and their proximity to the landfill and viewing the testimony in a light most favorable to the Plaintiffs, the court finds that the Plaintiffs meet the requirement that there is a "threat of release of hazardous substances." Parenthetically, the court notes that the Plaintiffs are under no burden to prove that hazardous substances were disposed of at the site. As a landfill, the site squarely falls within CERCLA's definition of a "facility." The Plaintiffs need only demonstrate that contaminants were released from the site, as Phase III revealed was the case. Indeed, in *United States v. Wade,* 577 F.Supp. 1326, 1339–41 (E.D.Pa.1983), the court held that a substance is hazardous regardless of the concentration or amount of any particular discharge; *see also Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 669 (5th Cir.1989). Ac-

cordingly, the Plaintiffs have met the second element in a private cause of action under CERCLA. Actual migration of hazardous substances and causation of actual contamination is not required under CERCLA. *See Nurad, Inc.,* 966 F.2d 837 (4th Cir.1992); *Dedham Water Co.,* 889 F.2d at 1154; *Shore Realty Corp.,* 759 F.2d at 1042–44.

### 3. *Costs Incurred Must Be Necessary and Appropriate Costs of Response*

Pursuant to 42 U.S.C. § 9607(a)(4)(B), the Plaintiffs must demonstrate that the costs they have incurred are "necessary costs of response." That monies expended by private-action CERCLA plaintiffs be necessary and appropriate costs is well-grounded in the decisional law. *See Ambrogi v. Gould, Inc.,* 750 F.Supp. 1233, 1239 (M.D.Pa.1990); *Artesian Water Co.,* 659 F.Supp. at 1285; *Jones v. Inmont Corp.,* 584 F.Supp. 1425, 1429 (S.D.Ohio 1984); *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1143 (E.D.Pa.1982). Initially, the court notes that any alleged injury is *not* a "response cost," much less a necessary response cost. CERCLA does not equate response costs with property damage. Response costs are themselves defined under the specific ambit of the Act, not under the generic calculus of the common law. Accordingly, the contention, as the Plaintiffs urge here, that *any injury* or damage is a "necessary response cost" is incorrect. Apart from the caselaw shaping these terms and the Act itself defining "removal" and "remedial" actions, the decisional law, as discussed more fully, *post* 1179, also reflects the distinction between response costs and damages under CERCLA. *See Mraz v. Canadian Universal Ins.,* 804 F.2d 1325, 1329 (4th Cir.1986); *see also Cincinnati Ins. v. Milliken and Co.,* 857 F.2d 979, 980 (4th Cir.1988); *Continental Ins. v. Northeastern Pharmaceutical & Chemical Co.,* 842 F.2d 977, 985–86 (8th Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *Maryland Cas. Co. v. Armco, Inc.,* 822 F.2d 1348, 1351–42 (4th Cir.1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988).

Although the courts concur that necessary response costs may be recovered, the courts

do not accord as to what expenses fall within the ambit of being "necessary." For example, some courts have restrictively interpreted "necessary costs of response" and limited what expenses plaintiffs may recover. The reason for curtailing certain expenses is that these courts subordinate the plaintiff's compensation to the purpose of the Act. These courts hold that the primary purpose of CERCLA is to provide for broad, liberal, remedial action in cleaning up the environment. Superfund money is, therefore, best spent on abating and curing contaminated sites. *See Lutz v. Chromatex, Inc.*, 718 F.Supp. 413, 417 (M.D.Pa.1989); *Wehner v. Syntex Corp.*, 681 F.Supp. 651, 653 (N.D.Cal. 1987); *Chaplin v. Exxon Co.*, 1986 WL 13130 (S.D.Texas 1986). Conversely, other courts are extremely receptive to permitting recovery for costs such as medical testing and loss of water use. *See Brewer v. Raven*, 680 F.Supp. 1176, 1179 (M.D.Tenn.1985); *Adams v. Republic Steel Corp.*, 621 F.Supp. 370, 376 (W.D.Tenn.1985); *Pinole Point Properties, Inc. v. Bethlehem Steel Corp.*, 596 F.Supp. 283, 288–90 (N.D.Cal.1984). Although not articulated, these courts apparently hold that compensation to injured parties is of paramount importance.

■ Fourth Circuit precedent is clear concerning the distinction between response costs and property damage. In *Mraz v. Canadian Universal Ins.*, 804 F.2d 1325 (4th Cir.1986), the Fourth Circuit distinguished CERCLA response costs from property damage. In *Mraz*, Paul and Sally Mraz owned and controlled Galaxy Chemical, Incorporated, which purchased insurance from defendant Canadian Universal Insurance. As part of its operations, Galaxy produced chemical wastes. To dispose of these wastes, Galaxy arranged to have 1300 barrels of its chemical by-products transported to a waste facility site. The arrangements for this disposal were conducted with the involvement and approval of local health department officials *Id.* at 1326.

■ After the enactment of CERCLA, the EPA and the state of Maryland notified Mraz that the barrels were hazardous and violated the Act. Galaxy was therefore ordered, but failed, to clean up the site. Because of Galaxy's inaction, the EPA and the state removed the barrels, disposed of the contaminated soil, and undertook other clean-up action. Seeking reimbursement, the United States and Maryland prosecuted an action against Galaxy and Mraz under CERCLA. The prayer of the complaint sought clean-up and removal costs plus additional administrative fees, costs, and interests. *Id.* Galaxy and Mraz then filed a declaratory judgment action seeking a declaration that Canadian Universal had a duty to defend them. Canadian Universal moved to dismiss, asserting that there had not been an "occurrence" as contemplated by the insurance policies and that the plaintiffs had not suffered a loss of property damage. *Id.* The district court held that Canadian was obligated to defend Galaxy and Mraz, but the Fourth Circuit reversed, holding that the United States and Maryland's actions were not "response costs" as contemplated by CERCLA:

> Response costs are not themselves property damages. An examination of CERCLA's provisions defining response, § 9601(23)–(25), and authorizing the President to take response action, § 9604, makes it clear that property damage and response are independent.... One cannot equate response costs with "injury to or destruction of tangible property," this policy's definition of property damage. Instead, response costs are an economic loss.

*Id.* at 1329. Although *Mraz* was decided in the context of construing terms pursuant to an insurance policy, the court believes that its reasoning is applicable here because *Mraz* specifically addressed the distinction between response costs and damages under CERCLA. *Mraz*, therefore, clearly demonstrates that not only is property damage not a "response cost" as contemplated by CERCLA, but also, by deduction, that not any and all actions undertaken by putative private-action CERCLA plaintiffs constitute "response costs." Under *Mraz*, the Plaintiffs in the present action cannot recover, at least under

CERCLA, for any property damages.[11] The Fourth Circuit has consistently reaffirmed the *Mraz* holding as to CERCLA response costs. *See Cincinnati Ins.,* 857 F.2d at 980; *Maryland Cas. Co.,* 822 F.2d at 1352–54. Conspicuously, the party seeking reimbursement for response costs in *Mraz, Cincinnati Ins.,* and *Maryland Cas. Co.,* was the Federal Government, which has easier burdens and a lesser threshold in prosecuting and prevailing in CERCLA actions than private plaintiffs. *See generally United States v. Ward,* 618 F.Supp. 884 (E.D.N.C.1985). If the Federal Government did not properly incur response costs and meet its CERCLA burdens, the likelihood of a private party doing so is even slimmer. Other caselaw comports with the distinction between damages and response costs under CERCLA. The *Artesian Water Co.* court, in denying plaintiff damages, held:

> This outcome, however, amply demonstrates the difference between an action for response costs under CERCLA and an action for damages in tort. Limiting recovery of the costs ... ensures that responsible parties will be liable under CERCLA only for necessary costs of response. Permitting recovery in any other circumstances would invite suits for a broad range of economic losses.... Congress did not intend for CERCLA, a narrowly drawn federal remedy, to be make injured parties whole....

*Artesian Water Co.,* 659 F.Supp. at 1299–1300. *Artesian Water Co.* mirrors *Mraz*'s ruling that any damages do not necessarily entail necessary response costs. Not all damages are, nor could be, necessary response costs. Accordingly, the Plaintiffs cannot recover, at least under CERCLA, for any alleged diminution in value to their property. The court, however, notes that investigative costs are recoverable, in certain circumstances, under CERCLA. *See Amoco Oil Co.,* 889 F.2d at 672.

 As stated, not all courts accord as to what response costs are recoverable under CERCLA. The inconsistencies in the caselaw are explained by the fact that CERCLA does not define or explain the term "cost of response." The statute is frustratingly tacit on this point. The Act merely defines the *concept* of "response." "Response" is defined as "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). This definition, in turn, hinges on the definitions of "remove" and "removal" and "remedy" or "remedial action." "Remove" or "removal," are thoroughly defined:

> [T]he cleanup or removal of released hazardous substances from the environment, such actions as may be [necessarily] [12] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act of 1974[,] [42 U.S.C. § 5121 *et seq.*]

42 U.S.C. § 9601(23). Similarly, "remedy" and "remedial action" are defined under CERCLA as:

> [T]hose actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the envi-

---

11. The court, of course, does not hold that testing expenses are not recoverable under CERCLA. *See generally post,* n. 14.

12. The actual subsection uses the word "necessary," but a footnote to the statute states that the word "probably should be 'necessarily.'"

ronment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction or secure disposition of hazardous substances and associated contaminate materials.

42 U.S.C. § 9601(24).

The concept of "response" has two subtle, but distinct, complexions: a "removal" action is a more limited, narrower response to a less drastic environmental problem. Removal actions do not contemplate lengthy, extensive cures; rather, by definition, removal actions are prescriptive in what they encompass. Removal concerns are more procedural in nature in that they speak to "monitoring," "assessing," and "evaluating" the measures necessary to abate short-term, manageable environmental cleanup. Also, removal actions are taken in response to an immediate threat since they are more limited in scope; the purpose of a removal action is to address quickly a short-term problem.

■ Conversely, "remedial actions" address more extraordinary environmental dilemmas. Remedial actions anticipate permanent solutions to contaminated sites. Hence, remedial actions, going to the crux of con-

tamination, provide for substantive, complex measures of abatement and cure. Not surprisingly, remedial actions entail more expense and greater long-term planning. Remedial actions are permanent in scope and therefore require more time to prepare and implement. Accordingly, response costs must be classified as either being "removal" or "remedial" before demonstrating their necessity. Distinguishing between a removal and remedial action is material:

> The distinction between these actions is of no small importance, for whereas removal actions need only comply with the relatively simple NCP requirements set forth at 40 C.F.R. § 300.65, ... remedial actions must comport with the 'more detailed procedural and substantive provisions of the NCP' as set forth at 40 C.F.R. § 300.68.

*Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 795 (D.N.J. 1989) (citations omitted); *see also Ambrogi,* 750 F.Supp. at 1240; *Channel Master Satellite v. JFD Elec. Corp.,* 748 F.Supp. 373, 385 (E.D.N.C.1990); *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563, 1577 (E.D.Pa.1988); *City of New York v. Exxon Corp.,* 633 F.Supp. 609, 614 (S.D.N.Y.1986) (holding that the distinction between removal and remedial is crucial in determining the propriety of recovering response costs). To incur justifiably response costs, a CERCLA plaintiff necessarily must have acted, under a removal or remedial action, to contain a release or threatened release. *See Amoco Oil Co.,* 889 F.2d at 669–70.

Under the NCP, a removal action is appropriate where there is an immediate threat to public health, safety, or the environment. Because of their immediate nature, removal actions are not subject to the lengthy procedural requirements of the NCP. Factors to be considered in determining the propriety of a removal action include:

> (i) Actual or potential exposure to hazardous substances or pollutants or contaminants by nearby populations, animals, or food chain;

> (ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate Federal or State response mechanisms to respond to the release;

(viii) Other situations or factors which may pose threats to public health or welfare or the environment.

40 C.F.R. § 300.65(b)(2) (1991). If an immediate removal action is appropriate, the NCP states that the following removal actions are generally appropriate:

(1) Fences and warning signs, or other security or site control precautions—where humans or animals have access to the release;

(2) Drainage controls—where precipitation or run-off from other sources may enter the release area from other areas;

(3) Stabilization of berms, dikes, or impoundments—where needed to maintain the integrity of the structures;

(4) Capping of contaminated soils or sludges—where needed to reduce migration of hazardous substances into soil, groundwater, or air;

(5) Using chemicals and other materials to retard the spread of the release or to mitigate its effects—where the use of such chemicals will reduce the spread of the release;

(6) Removal of highly contaminated soils from drainage or other areas—where removal will reduce the spread of contamination;

(7) Removal of drums, barrels, tanks, or other bulk containers that contain or may contain hazardous substances where it will reduce the likelihood of spillage, leakage, exposure to animals or food chain, or fire or explosion;

(8) Provision of alternative water supply—where it will reduce the likelihood of exposure of humans or animals to contaminated water.

40 C.F.R. § 300.65(c)(1)(8).

A remedial action, however, is measured against other standards. Specifically, 40 C.F.R. § 300.71(a)(2)(ii) states that where an action is remedial, the response must: (A) provide for appropriate site investigation and analysis of remedial alternatives as required under 40 C.F.R. § 300.68; (B) comply with paragraphs (e) through (i) of 40 C.F.R. § 300.68; (C) be cost-effective; and (D) provide for public comment unless otherwise provided. Accordingly, the Plaintiffs must satisfy both 40 C.F.R. § 300.71(a)(2)(ii) and 40 C.F.R. § 300.68.

Subsection 300.68(d) describes the necessary study:

Remedial Investigation/Feasibility Study. An RI/FS shall, as appropriate, be undertaken by the lead agency conducting the remedial action to determine the nature and extent of the threat presented by the release and to evaluate proposed remedies.... Part of the RI/FS may involve assessing whether the threat can be prevented or minimized by controlling the source of contamination at or near the area where the hazardous substances were originally located.... Planning for remedial action at these releases, shall, as appropriate, also assess the need for removals. During the remedial investigation, the original scoping of the project may be modified based on factors in § 300.68(e).

Section 300.68(e) provides that the EPA in cooperation with the state will examine the available information and determine, based on the factors cited in (e)(2), the type of response needed to remedy the release. Subsection (e)(2) provides that the following factors will be assessed in determining whether and what type of remedial and/or removal actions will be considered:

(i) Population, environmental, and welfare concerns at risk;

(ii) Routes of exposure;

(iii) Amount, concentration, hazardous properties, environmental fate and transport, and form of the substances present;

(iv) Hydrogeological factors, such as soil permeability, depth to saturated zone, hydrologic gradients, proximity to a drinking water aquifer, floodplains, and wetlands;

(v) Current and potential groundwater use;

(vi) Climate;

(vii) The extent to which the source can be adequately identified and characterized;

(viii) Whether substances at the site may be reused or recycled;

(ix) The likelihood of future releases if the substances remain on-site;

(x) The extent to which natural or man-made barriers currently contain the substances and the adequacy of the barriers;

(xi) The extent to which the substances have migrated or are expected to migrate from the area of their original location, or new location if relocated, and whether future migration may pose a threat to public health, welfare, or the environment;

(xii) The extent to which Federal environmental and public health requirements are applicable or relevant and appropriate to the specific site, and the extent to which other Federal criteria, advisories, and guidance and state standards are to be considered in developing the remedy;

(xiii) The extent to which contamination levels exceed applicable or relevant and appropriate Federal requirements or other Federal criteria, advisories, and guidance and State standards;

(xiv) Contribution of the contamination to an air, land, water, and/or food chain contamination problem;

(vx) Ability of responsible party to implement and maintain the remedy until the threat is permanently abated;

(xvi) For Fund-financed responses, the availability of other appropriate Federal or State response and enforcement mechanisms to respond to the release; and

(xvii) Other appropriate matters.

Subsection 300.68(f) provides that at least one alternative remedial scheme must be developed as part of a Feasibility Study in four (4) categories. Subsection 300.68(g) states that the alternative remedies developed under (f) shall be narrowed down and states that cost, engineering practices, and effectiveness will be the criteria used to screen section (f)'s alternatives. Subsection (h) also contemplates various factors to be used in determining cost, engineering acceptability, and effectiveness, along with the gathering of more data concerning the site. Also, subsection (h) provides that more detailed evaluations of all the information gathered in subsection (g) will be conducted. Finally, subsection (i) states the criteria for determining the appropriate remedy for the site. The main thrust of subsection (i) is that the selected remedy be both cost-effective and effectively mitigate the threat to the environment. Subsection (i) also enunciates numerous factors to consider in determining the propriety of the remedy.[13] Against these criteria for removal and remedial actions, the court must examine the actions taken by the Plaintiffs.

Initially, the court notes that the Plaintiffs themselves have not definitively characterized or pled their response as either removal or remedial, although such characterization would not be dispositive. In the memoranda and Amended Complaint submitted by the Plaintiffs, there is a single, conclusory allusion to the type of response: paragraph 18 of the Amended Complaint states "[t]he Plaintiffs' expenditures ... are costs of 'remedial' action and 'response' within the meaning of CERCLA." This single, unsupported allegation does not rise to the level of constituting a removal action, let alone the more-detailed remedial action. The Plaintiffs have simply failed to allege and demonstrate, either substantively or procedurally, that they have

13. Reciting *verbatim* all provisions of 40 C.F.R. § 300.68 would consume considerable space. The highlights of the individual sections are discussed in the text of this opinion.

incurred response costs which are either removal or remedial in nature. The Plaintiffs have offered no evidence as to what costs they have incurred and why such costs were incurred. The Plaintiffs have offered the barest of explanations of what activity was encompassed by their costs. Their suit papers merely recite bald assertions as their costs: "The Plaintiffs have incurred response costs such as investigative and testing expenses in addition to costs related to enforcement." ("Plaintiffs' Memorandum In Opposition To Defendant's Motion For Partial Summary Judgment," at 6). "The Plaintiffs have incurred preliminary investigative and enforcement costs due to this contamination." *Id.* at 7. "The Plaintiffs have taken the necessary preliminary steps in defining the scope and extent of contamination at the landfill and on their property." *Id.* at 8. "The Plaintiffs have incurred ... [c]osts associated with the investigation of data and documentation on the nature, extent and scope of the contamination upgradient of the Plaintiffs' property." ("Surreply To Defendant's Motion For Partial Summary Judgment," at 7). The Plaintiffs never even explain what any of these "costs" are, let alone that they are "necessary costs of response." Strictly from a procedural analysis, therefore, the Plaintiffs have not demonstrated that their response fits the bill for either type of action. Since the Plaintiffs have not definitively cast or pled their response as either removal or remedial, the court will apply the factors cited above as enunciated in the Code of Federal Regulation to determine if the Plaintiffs have satisfied either a removal or remedial action.

▇ Applying the removal factors yields: (1) The actual or potential exposure to nearby populations, animals, or food chains is minimal. Indeed, to the extent hazardous substances exist, they are below the state safety levels, with the exception of benzene. Also, there is no nearby population—none of the Plaintiffs inhabit the property in question; moreover, not all of the parcels are adjacent to the site. Finally, the Phase stud-

ies concluded that no remediation was necessary or required at the site. (2) Likewise, the issue of drinking-water supplies is also not an issue. In the case at bar, only one house is situated on the parcels of land; and it draws its drinking water supply from the county public water system. Moreover, this parcel is not even adjacent to the landfill. Finally, the Phase studies concluded that no remediation was necessary at the site. (3) There is no bulk storage at the site in barrels or tanks. The site is a landfill. (4) There are no high concentrations of hazardous materials in soils at or near the site's surface. Indeed, the concentration of hazardous substances is low, with the exception of benzene. Moreover, the threat of migration is minimal. According to the Phase reports, the clay cap on the landfill will operate to halt the migration and reduce the concentration of VOC at the site. (5) The weather conditions at the site do not greatly affect the environmental condition. (6) There have been no fires or explosions, nor have any been averred. Again, this is an ordinary landfill which accepts only household waste and approved industrial waste. (7) There is no showing that other response mechanisms are not available to the Plaintiffs. Indeed, the evidence shows an active involvement in the matter by the South Carolina Department of Health and Environmental Control. There has been no intervention by any branch of federal, state, or municipal Government[14] to suggest other cleanup mechanisms need exploration, primarily because the scientific reports concluded no remediation is necessary. Once again, the Plaintiffs have offered no evidence that they lack any other mechanism that may provide relief. (8) No other factors exist which pose further threats to public health and safety.

Having failed to satisfy the requisite factors indicating a "removal action," the inescapable conclusion is that the Plaintiffs' response was not such an action. Finally, even if this were a removal action, the Plaintiffs' response is not an "immediate removal" be-

---

**14.** As the court has previously held, *ante* n. 10, and as discussed more fully below, *post* nn. 15 & 16, Government action, of course, is not a prerequisite to prosecuting a private action under

CERCLA. *See Richland–Lexington Airport Dist. v. Atlas Properties, Inc.,* 901 F.2d 1206 (4th Cir. 1990).

cause it has not complied with the factors considered appropriate pursuant to 40 C.F.R. § 300.65(c)(1)(8). Specifically, the Plaintiffs have made no references to fences and warning signs to prevent human and animal access to their property, or drainage controls to prevent run-off from other sources, nor have they alleged constructing dikes and impoundments to maintain the structural integrity of their property and the fixtures situated on it. Accordingly, the Plaintiffs cannot bring their response within the purview of a removal action, immediate or otherwise.

 Next, the Plaintiffs' response must be measured against the criteria for a remedial action. Initially, if the Plaintiffs have failed to fall within the ambit of the lower-threshold removal action, their chances of satisfying the element for the more stringent remedial action are very slender. A remedial action requires that 40 C.F.R. § 300.-71(a)(2)(ii) be satisfied, a requisite which the Plaintiffs have failed. Specifically, this subsection shifts a complaining party to 40 C.F.R. § 300.68 and provides that all subsections of 40 C.F.R. § 300.68, be satisfied before a remedial action exists. Thus, the court now turns to §§ 300.68(d) and 300.-68(e)–(i) to evaluate the Plaintiffs' response. The Plaintiffs have not complied with § 300.-68(d) because no study was conducted by any agency to determine the nature and extent of the release. No agency, specifically the EPA, has conducted a study as to the site. Moreover, the Plaintiffs have submitted no evidence to show that the costs they incurred related to designing remedial measures. Thus, 40 C.F.R. § 300.68(d) has not been satisfied. Some courts have expressly held that the absence of a proper RI/FS defeats a claim of compliance with the NCP. *See Channel Master Satellite v. JFD Elec. Corp.*, 748 F.Supp. 373, 387 (E.D.N.C.1990); *Versatile Metals, Inc. v. Union Corp.*, 693 F.Supp. 1563, 1582 (E.D.Pa.1988). The *Artesian* court held that any notions of a "substitute" for a "detailed, site-specific RI/FS the NCP requires of a lead agency is ... untenable." *Artesian Water Co.*, 659 F.Supp. at 1296.

Such holdings comport with the purpose of the Act—if sites are not properly inspected pursuant to appropriate studies, then coherent cleanup is defeated, which, of course, defeats the overall scheme of CERCLA. Thus, the lack of an appropriate RI/FS's defeats a CERCLA claim and disserves the ultimate end of promoting the Act's purpose.

Among other detailed requirements, section (e)(2) enunciates seventeen (17) factors, as cited above, to consider in determining whether and what kind of remedial and/or removal action will be considered. Analyzing the present case under the material factors yields: (1) There is neither a risk to the population nor the general public welfare. (2) The concentration levels of hazardous materials do not present a health risk; all such concentrations for which there are regulatory standards fall below the maximum level of contamination, except for benzene and chloride in well 7A. Also, placing a clay cap on the site will, according to the Phase reports, obviate the need for any future remediation. (3) The site is not located adjacent to wetlands or centers of population—none of the Plaintiffs even inhabit the parcels. (4) Climate and recycling do not effect the site. The site has not been characterized as expressly or explicitly needing remediation; VOC exist only in trace amounts and form no identifiable plume. There is, however, a concentration of benzene in a monitoring well that exceeds EPA standards. (5) The Phase reports concluded that no remediation was necessary and that a clay cap would halt any further advances of VOC. Additionally, there is continued monitoring of the wells. There are, therefore, barriers to any possible future contamination. Thus, the likelihood of further releases is minimal. (6) No migration is anticipated. As stated, the clay cap will prohibit and disperse any remaining trace of VOC. (7) Significantly, neither the federal, state, nor local Government has recommended any specified remedial plan or cleanup. The Department of Health and Environmental Control did, however, recommend that a clay cap cover the site. No action has been recommended as to the site.[15]

---

15. The court directs the parties to the specific language used in this order: "neither the federal, state, nor local government has *recommended* any remediation." This does *not* state that such governmental action is *required*.

This lack of interest and intervention by the Government is persuasive to the court. The Plaintiffs have offered no evidence by any branch of Government that any remediation or removal is required. No authority has determined that the site poses any threat to the health, safety, or welfare to the public or environment. (8) Again, concentrations of any hazardous substances are below the state maximum safety standards, except for benzene and chloride found in a single monitoring well. (9) Finally, the air, land, and food chain are not alleged to be adversely affected by the landfill. Finally, the Plaintiffs have also not satisfied 40 C.F.R. § 300.-71(a)(2)(ii)(C) or (D): there is no proof that the alleged response was "cost effective" or that "public comment concerning the selection of a remedial action" was entertained. Accordingly, the irresistible conclusion is that the Plaintiffs have not proved the elements necessary to show that their response was a "remedial action."

■ Finally, the affidavit of the Plaintiffs' geologist, Andrew Wilson, does not compel a different conclusion. Interestingly, Mr. Wilson never stated in his affidavit whether the Plaintiffs' response was either a removal or a remedial action. (*See* "Affidavit of Andrew Wilson"). As discussed, this threshold determination is critical in deciding whether a particular response is a removal or remedial action, which, in turn, determines the provisions of the NCP with which a party must comply. Failure to make this initial determination automatically inhibits the next step in deciding how to proceed under CERCLA. Mr. Wilson does state, however, that he "believes" that the Plaintiffs' response is consistent with the NCP. *Id.* at ¶ 10. Mr. Wilson's beliefs are wholly immaterial: (1) The affidavit merely states beliefs, not facts. (2) More importantly, the proper classification of a cleanup is an issue of law for the court, not an issue to be resolved by expert testimony. Also, any legal testimony, which is outside Mr. Wilson's area of expertise, would be excluded pursuant to Rule 702 of the Federal Rules of Evidence. *See Channel Master*, 748 F.Supp. at 386 (similarly rejecting an expert geologist's statements as to compliance with the NCP).

■ *Channel Master* is illuminating on the point of what measures are necessary to constitute a "remedial action." The *Channel Master* plaintiffs conducted numerous and exhaustive studies on the extent of contamination of their site. Channel Master executives met with representatives of the North Carolina Solid and Hazardous Waste Management branch to review their cleanup alternatives. *Id.* at 377. Like the Plaintiffs in the present suit, Channel Master installed groundwater wells on and downgradient to the site. *Id.* Analysis of the water revealed concentrations of chromium and VOC. After reviewing various plans with environmental consultants and engineers, Channel Master eventually submitted a cleanup plan, which was approved by the state of North Carolina, although the state was not involved in the consideration of cleanup alternatives. Additionally, Channel Master apprised the EPA of its response activities, and the EPA recommended that Channel Master meet with state officials to develop appropriate standards for cleanup. *Id.* at 380. Moreover, after further amendments to the plan, the EPA was notified as to the progress at the site. The EPA responded that it had no comment at that time, but that the agency had been assured that state authorities were closely involved in monitoring and implementing the response, which was considered "satisfactory." *Id.* The EPA, therefore, was kept abreast of Channel Master's activities, but it was likewise not involved in the consideration of cleanup alternatives.

The ultimate conclusion of the chemical analyses stated:

> [I]t can be seen that *metals are not a problem with the ground water.* In addition, the EP toxicity values for metals were all below detection limit for the seven soil samples [taken from the well located in the lagoon] thereby verifying that *metal contamination was not significant.* . . . [T]he report made no cleanup recommendations . . . .

*Id.* at 378. Although the site reports revealed that there was no threat to safety or environment and that all detected substances met regulation concentrations, Channel Master reviewed seven (7) alternative cleanup

plans. *Id.* at 379. Channel Master's actions, therefore, were not vacuous. Quite the contrary, Channel Master conducted site tests, contacted both the state environmental agency and the EPA, and reviewed a multiplicity of plans before deciding on a course of action. Channel Master was far from cavalier in its execution of the cleanup.

The district court, however, granted summary judgment in favor of the defendant. In a well-reasoned opinion, the court concluded that Channel Master's plan was a "remedial action" but that it did not comply with CERCLA's requirement that such actions be executed with Governmental approval and consistency with the NCP. The court found Channel Master's pursuing cleanup remedies after the chemical analyses demonstrated no toxic level of hazardous substances and the lack of state or EPA involvement in the consideration of cleanup to be fatal to the private-action CERCLA claim:

> It is undisputed that neither EPA nor state environmental officials were involved in this consideration of cleanup alternatives.... No analysis was made of the effect of the concrete on the potential for chrome leaching into the groundwater, or the effect of this alternative on human population, plant life or the environment.
>
> ....
>
> It is undisputed that Channel Master did not utilize, nor did it reference, *any* federal regulations in preparing the cleanup plan. It did not make *any* effort to comply with the NCP in the cleanup plan.... Nor did Channel Master make an analysis of the impact of any cleanup method on public health or the environment, or make any analysis of the public health risks posed by the chrome or VOC.

*Id.* at 378, 379–80.

Under *Channel Master,* the present Plaintiffs' actions pale in comparison. The Plaintiffs' response was not as comprehensive as that of Channel Master. Moreover, the Plaintiffs did not contact the state environmental agency or the EPA, which the *Channel Master* court found to be fatal to the

CERCLA claim. The *Channel Master* analysis reports concluded that the substances detected at the site were not present at toxic levels. The same conclusion was reached by the Phase reports in this suit, save for benzene in one well. This finding of acceptably low concentrations, coupled with the fact that none of the Plaintiffs acted under Government standards, compels that the *Channel Master* judgment is warranted in the present action. *Channel Master,* therefore, is persuasive authority for holding that the Plaintiffs' lack of cohesive, Government-authorized action defeats a private-action claim under the Act.[16]

In addition to being either a removal or remedial action, the Plaintiffs' response must be "necessary." 42 U.S.C. § 9607(a)(4)(B). As stated, while "necessary response costs" are not defined in CERCLA, the courts have held that investigatory activities such as monitoring and sampling are within the purview of "necessary responses costs," and are therefore recoverable. *See Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir. 1989); *Cadillac Fairview/California, Inc. v. Dow Chem. Co.,* 840 F.2d 691, 694–95 (9th Cir.1986); *Wickland Oil Terminals v. ASARCO, Inc.,* 792 F.2d 887, 892 (9th Cir.1986); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1043 (2d Cir.1985); *Ambrogi v. Gould, Inc.,* 750 F.Supp. 1233, 1244 (M.D.Pa.1990); *Brewer v. Ravan,* 680 F.Supp. 1176, 1179 (M.D.Tenn.1988). One distinguishing characteristic in these cases, which is conspicuously absent from the case at bar, is the fact that the investigatory testing was conducted at the direction of the state and under state auspices; the Government ordered that the work be done. For example, in *Wickland, Cadillac,* and *Shore Realty* the plaintiffs incurred costs because the states decreed that the sites be cleaned up. The situation in the present case presents the reverse scenario: the Plaintiffs' testing is vacuous and not executed pursuant to any Governmental authority. Once again, the Plaintiffs have offered no evidence or explanation of what their response entails, past the initial testing. The

---

**16.** A private right of action exists under CERCLA, and Government prosecution of a CERCLA action is not first required before a private party

can commence his suit. *See* 42 U.S.C. § 9601(21).

Amended Complaint only cryptically refers to "expenditures in connection with investigating, sampling and analysis." ("Amended Complaint," ¶ 20). Similarly, the Plaintiffs' memoranda vaguely refer to "preliminary investigative and enforcement costs" and "investigative, analytical and testing expenses." There is no explanation as to what these self-serving phrases entail or what these investigations encompass. The *Ambrogi* court made this observation concerning vague allegations made pursuant to CERCLA response costs:

> [I]t would appear that possibly the vague and overly broad description of "costs of cleanup," as well as "expert fees" and "investigative expenses" may be recoverable costs. . . . [However] because of the vague and conclusory "terms of art" used by Plaintiffs to describe their response activities, this court is still unaware of any specific actions taken or cost incurred by the Plaintiffs.

*Ambrogi*, 750 F.Supp. at 1244. Accordingly, the *Ambrogi* court granted summary judgment in favor of the defendant for the plaintiffs' conclusory, unsubstantiated allegations of "necessary response costs" and for the lack of consistency with the NCP. In the case at bar, the Plaintiffs have incurred expenses with absolutely no suggestion from federal, state, or local authorities to do so. Indeed, these actions were expressly *not* recommended based on the Phase analyses of the site. The Phase reports all concluded that no remediation was necessary. Thus, the Plaintiffs have no basis to claim that their response activities, whatever they may have been, are "necessary." Failure to have brought themselves within the statutory definition of "necessary costs of response" has proven fatal to the Plaintiffs' CERCLA action. Therefore, regardless of the characterization of the Plaintiffs' response as removal or remedial had they satisfied either of those classifications, the Plaintiffs have failed to demonstrate their activities were "necessary." Accordingly, the Plaintiffs have failed meeting a *prima facie* element of their CERCLA claim.

Finally, the court notes that this necessity requirement also serves the broader purposes of the Act. CERCLA was enacted to facilitate coherent cleanup of hazardous waste disposal sites. The Act is not a panacea for all toxic or waste-disposal ills. The necessity requirement ensures that CERCLA does not blossom into a general toxic tort statute in which any number of aggrieved parties may find refuge:

> This outcome, however, amply demonstrates the difference between an action for response costs under CERCLA and an action for damages in tort. Limiting recovery . . . to cases of actual or threatened contamination of the existing water supply ensures that responsible parties will be liable under CERCLA only for necessary costs of response. Permitting recovery in any other circumstances would invite suits for a broad range of economic losses and ultimately transform CERCLA into a toxic tort statute. Congress did not intend for CERCLA, a narrowly drawn federal remedy, to make injured parties whole or to be a general vehicle for toxic tort actions. Unless Congress sees fit to provide such a remedy, full compensation for hazardous waste harms will in most instances remain the province of state law.

*Artesian Water Co.*, 659 F.Supp. at 1299–1300. In the case at bar, the Plaintiffs are attempting to recover for an alleged injury beyond the scope of CERCLA. Such general recovery for alleged property value diminution is simply outside the parameters of the Act:

> There is an inclination, however, to attempt to stretch some legislation in directions it was not meant to go. Here, for instance, we find an effort to extend the Superfund Act, which was designed for clean-up purposes, into the general area of tort law, which is used to recover personal expenses and property damage. We find no such authority or interpretation in the Superfund legislation for such a conclusion and, instead, hold that Plaintiffs' efforts at damage recovery must be confined to traditional state tort law parameters.

*Ambrogi*, 750 F.Supp. at 1259.

### 4. *Causation*

Initially, the court notes that because the Plaintiffs have failed to demonstrate the in-

currence of necessary response costs and that their actions were consistent with the NCP, the issue of causation is largely moot. The court, however, will proceed to discuss this element of a private-action CERCLA claim.

■ The fourth element that the Plaintiffs must aver and prove is that the threatened release caused them to incur necessary response costs. Although a provision for strict liability is not expressly enunciated in the Act, Congressional intent reveals that responsible parties are to be held absolutely liable for violations, save for the three (3) enumerated defenses cited in the Act.[17] Section 9601(32) states that liability under CERCLA shall be construed to be the standard under section 311 of the Clean Water Act, *as amended* 33 U.S.C. §§ 1251–1376 (1988), which liability courts have held to be strict liability. *See Steuart Trans. Co. v. Allied Towing Corp.*, 596 F.2d 609, 613 (4th Cir.1979). Also, apart from the statutory reference to the liability provisions of the Clean Water Act, the legislative history of CERCLA's progenitors, H.R. 7020 and S. 1480 called for strict liability. Additionally, the sponsors of the compromise from which CERCLA sprang explicitly stated that § 9607 mandates strict liability. *See* S. 1480,

96th Cong., 2d Sess. § 4(a), 126 Cong.Rec. 30,908; H.R. 7020, 96th Cong., 2d Sess. § 3071(a)(1)(D), 126 Cong.Rec. 36,779. *See also* 126 Cong.Rec. S14964 (daily ed. Nov. 24, 1980), ("We have kept strict liability in the compromise, specifying the standard of liability under § 311 of the Clean Water Act.") (statements of Senator Randolph). CERCLA, therefore, provides for strict liability of the offending party; and the decisional law reflects this statutory mandate. *See also United States v. Monsanto Co.*, 858 F.2d 160, 167 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042 (2d Cir.1985); *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 790 (D.N.J.1989); *United States v. Price,* 577 F.Supp. 1103, 1113–14 (D.N.J.1983) (holding that CERCLA is a strict liability statute).

■ CERCLA's strict liability provisions, however, do not completely abrogate the requisite that causation be alleged and shown. The derogation of liability does not eliminate the complaining party's burden of demonstrating a causal connection between a release or threatened release and the incurrence of response costs.[18] CERCLA, there-

---

17. CERCLA establishes three (3) affirmative defenses to liability for the release of hazardous substances. Section 9607(b) provides that a defendant may prove by a preponderance of the evidence that the release or threatened release was caused solely by: (1) an act of God; (2) an act of war; or (3) an act or omission of a third party unrelated to the defendant. *See* 42 U.S.C. §§ 9607(b)(1), (2), 9607(b)(3).

18. Section 9607(a)(4) provides: "from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable ..." The punctuation and grammar of this section affect the issue of causation. The perennial distinction between "that" and "which," along with the concomitant punctuation of the type of clauses these words introduce, presents more than idle speculation. A restrictive clause modifies a sentence differently from an identically-phrased nonrestrictive clause. A restrictive clause identifies a subset of the object described and directs the meaning of the sentence to that subset. A nonrestrictive clause, however, modifies the entire set as already described. Nonrestrictive clauses must be set off by commas, while restrictive clauses must not be set off by commas. "That" cannot be used to introduce a nonrestric-

tive clause; conversely, "which" should not be used to introduce a restrictive clause. Since "which" and not "that" is used in § 9607(a)(4), the implication is that the clause is nonrestrictive. This, of course, means that a "threatened release" is subject to the causation requirement because the causation clause of the statute is introduced by "which." Although seemingly academic, the distinction is genuine. The problem with § 9607(a)(4), however, is complicated by the fact that the causation clause does not follow a comma: the lack of a comma suggests that the modifying clause is restrictive; the word "which" suggests that the clause is nonrestrictive. This distinction reflects CERCLA's inherent ambiguity. "Which causes" as opposed to "that causes," particularly when coupled with punctuation errors, results in uncertainty as to whether liability exists from a release without the incurrence of response costs. *See generally* H. Ramsey Fowler, *The Little, Brown Handbook* 601 (3d ed. 1986). The court, however, need not attempt to reconcile this legislative nightmare because the Plaintiffs in the present action have not demonstrated consistency with the NCP, which proves fatal to their action.

fore, conjures up the specter of "causation," that problem child of the law:

An essential element of the plaintiff's cause of action ... is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered. This connection is usually dealt with by the courts in terms of what is called "proximate cause," or "legal cause." There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion. Nor, despite the manifold attempts which have been made to clarify the subject, is there yet any general agreement as to the best approach.

W. Keeton, D. Dobbs, R. Keeton, D. Owens, *Prosser and Keeton on Torts*, § 41, at 263 (5th ed. 1984). While causation may be elusive, a CERCLA plaintiff still shoulders the burden of alleging and proving an unbroken chain of events occurred which bridged his necessary response costs to the defendant's conduct.

Section 9607(a)(4) expressly requires that a release or threatened release exist *"which causes* the incurrence of response costs." (emphasis supplied). Thus, the plain language of the statute declares that there must be a connection, a relationship, a direct and analogous event, which links the leaching of hazardous materials to the necessary response costs expended by the plaintiff. The courts, while holding that CERCLA imposes strict liability, have consistently required a plaintiff to demonstrate unequivocally causation between the alleged wrong and the incurrence of necessary response costs. *See Shore Realty Corp.,* 759 F.2d at 1044 n. 17; *Artesian Water Co.,* 659 F.Supp. at 1282. *Idaho v. Bunker Hill Corp.,* 635 F.Supp. 665, 674 (D.Idaho 1986); *see also* W. Keeton, D. Dobbs, R. Keeton, and D. Owens, *Prosser and Keeton on Torts* § 79, at 559-60 (5th ed. 1984), stating as to strict liability and causation:

But such extended responsibility may undoubtedly impose too heavy a burden upon the defendant. It is one thing to say that a dangerous enterprise must pay its way within reasonable limits, and quite another to say that it must bear responsibility for every extreme of harm that it may cause.... [R]estrictions of liability ... in connection with ... "proximate cause" ... demand here that some limits be set.

Finally, the Congressional reports from the bills giving rise to CERCLA indicate that principles of causation apply to CERCLA claims. *See* H.R.Rep. No. 96–1016, 96th Cong., 2d Sess., 33–34 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119; S.Rep. No. 1480, 96th Cong., 2d Sess. 4(a) (1980). The Plaintiffs must, therefore, show that they incurred necessary response costs as a direct result of a threatened release of hazardous substances from the landfill. Failure to allege properly causation and failure to produce independent evidence of this causation requirement will prove fatal to the Plaintiffs' claims.

■ Applying the causation principle to the instant action, the court holds that the Plaintiffs have failed to make the requisite showing of causation. There is simply no causal connection between the release, to the extent one exists, and the response made by the Plaintiffs and the necessary costs incurred pursuant to that response. Specifically, the Plaintiffs have offered no evidence to support their conclusory allegations that the site has caused them to incur necessary response costs as that term has been shaped by the caselaw.

Parenthetically, the court notes that the landfill has been operated under Governmental auspices and approval since inception; also, the site is repeatedly inspected and status reports evaluating the landfill are regularly issued. The Plaintiffs, in their briefs, baldly assert that the landfill has not satisfied the state requirements for cleanliness. This allegation, however, is not precisely accurate: the "South Carolina Department of Health and Environmental Control Bureau of Solid & Hazardous Waste Management Solid Waste Disposal Site Inspection Sheet" states that some aspects of the site "need improvement," not that the site has violated minimum health standards. Second, the landfill has consistently had permits issued to it by the Department of Health and Environmental Control and has accepted only "routine" household waste and authorized industrial

wastes. Also, the Plaintiffs have forwarded no evidence demonstrating that the landfill is not properly operated or has accepted types of waste it is barred from receiving. Third, the Phase reports explicitly concluded that no remediation was required or necessary as to the site, although the Plaintiffs did submit a report that benzene concentrations in a monitoring well had exceeded EPA standards. The *facts* uncontrovertedly evince that many toxic metals have not pervaded the groundwater; lead was shown to be at concentrations below the safety level; nitrates and sulfates are not hazardous substances; VOC were localized and did not form an identifiable plume of contamination. As the *Channel Master* court noted, this lack of any Governmental intervention or approval of a CERCLA plaintiff's putative response pursuant to the Act supports the conclusions that summary judgment is properly granted in favor of the defendant. *Channel Master,* 748 F.Supp. at 378–80. Again, these substantive facts clearly establish no causal relationship between any alleged injury sustained and necessary response costs incurred by the Plaintiffs. In other words, the Plaintiffs incurred expenses in order to determine if there were an injury. Since the Plaintiffs did not learn of the alleged injury until *after* they expended funds, they can hardly argue that these costs were a necessary response to the injury. Of course, in proper circumstances, investigative costs are recoverable under CERCLA as necessary response costs, while diminution in land value is not. Investigative costs do not exist in a vacuum. Before such costs can be recovered, however, they must exist as part of a plan for cleanup that is consistent with the NCP, that is properly authorized, and that demonstrates the expenses a plaintiff incurred were not only necessary costs of response, but also causally linked to the defendant's conduct. Fourth,

the Plaintiffs do not consume the water on their properties located next to the landfill, nor have any federal, state, or municipal authorities determined that the site poses a threat to health or the environment. Equally, such authorities have not suggested that any response should be taken with respect to the site. Fifth, the Plaintiffs conspicuously do not address the issue of causation in their briefs. The Plaintiffs simply state that their costs are "essentially a causation requirement." (Plaintiffs' "Memorandum in Opposition to Defendant's Motion for Summary Judgment," at 6). The Plaintiffs then simply recite that "common law principles do not apply to CERCLA," which, as discussed above, is not completely accurate. Such *seriatim* recitations do not causation prove. Even if the Plaintiffs could substantively prove causation, they have failed in their procedural burden by not proffering to the court any indicia that there is a direct, uninterrupted succession of interlocking events cohesively binding their necessary response costs to the threatened release of the landfill.[19]

The court also notes that the Affidavit of Andrew Wilson, the Plaintiffs' geologist, does not state that there is causation. The Affidavit merely recites: "In my professional opinion the contaminant plume located at the downgradient edge of the Darlington County Landfill and onto the Plaintiffs' property is most likely, to a reasonable degree of scientific certainty, from the waste deposited in the landfill." ("Affidavit of Andrew Wilson," ¶ 4). The Affidavit does not state that there is any causation or that the site has caused the Plaintiffs to incur *necessary costs of response.* The Affidavits of the Plaintiffs themselves are also insufficient. Each Plaintiff submitted an affidavit which merely recited: "I have incurred costs related to the

---

19. The "threat of release" is not to be judged subjectively by the plaintiffs. Rather, that determination is judged by an objective standard to be based upon facts and reasonable inferences drawn therefrom:

We also note that liability in respect to costs caused by releases (or threatened releases) that do not in fact contaminate wells exists only where the statutory requirements are·met; and the relevant standards are objective. Obviously, a New Jersey well owner who began to

make local-area contamination studies because of releases occurring in California [*i.e.*—parties on opposite sides of the country] could not claim, objectively speaking, that the California releases "cause[d]" the costs, or that his expenditures were "necessary" and "consistent with the national contingency plan."

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1158 (1st Cir.1989) (citations omitted).

hydrogeological investigation of the groundwater contamination from the Darlington County Landfill. I have incurred costs related to the analytical testing of the groundwater adjacent to the landfill. I incurred these costs because of information received that the Darlington County Landfill had impacted the environment of my own property and my family's property." (*See* Affidavits of Individual Plaintiffs, ¶¶ 2–4). Initially, these affiants are not experts, so their value is of little weight. The test is not a subjective one. Secondly, these affidavits likewise do not suffice to establish the requisite causation requirement. The court concludes that the Plaintiffs have not satisfied the causation element. Regardless, because the Plaintiffs have not shown that their actions were "necessary response costs" that were incurred consistent with the NCP, the Plaintiffs have not succeeded on their CERCLA action.

### 5. *Response Must Be Consistent With the NCP*

While concluding that the Plaintiffs have not prevailed in establishing their *prima facie* case as to the causation and necessary response elements of a CERCLA action, the court is compelled to discuss the final element of the claim—consistency with the National Contingency Plan. The NCP, promulgated by the EPA, is a series of regulations that prescribes procedures and standards for waste cleanup sites. The purpose of the NCP "is to give some consistency and cohesiveness to response planning and actions." H.R.Rep. No. 96–1016, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.C.C.A.N. 6119, 6133. That private actions prosecuted under CERCLA comport with the NCP is apparent from the legislative history:

The plan will contain guidance on cost-effectiveness. Such guidelines are intended to assure that alternative remedial options are considered when planning cleanup actions at a particular site. This guidance will also provide both criteria and procedures for selection of the most cost-effective and environmentally sound alternative for remedying the site. This selection will require a balancing of a variety of factors, including cost and engineering, to achieve the health and environmental goals of the legislation.

126 Cong.Rec.S. 14,965 (daily ed. Nov. 24, 1980) (statements of Senator Randolph).

Because the EPA is the agency charged with administering the NCP, the EPA's interpretation of the Plan is accorded considerable deference. *See Train v. Natural Resources Defense Council*, 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975). The NCP has demanded consistency with its determinations to prevail upon a private-action CERCLA claim:

[B]ecause [42 U.S.C. § 9607] authorizes private cost recovery *only for actions that are "consistent with" the NCP*, EPA has an obligation, as promulgator of the NCP to explain how private actions may be so consistent.... In this rule ... EPA has modified [40 C.F.R.] § 300.71 *to specify in detail what private parties must do in order to act consistently with the NCP.*

50 Fed.Reg. 47,934 (1985) (emphasis supplied). The *Preamble* to the NCP further provides:

The most important factor of any response action is the ultimate level of cleanup to be achieved at a site. For remedial actions, the most important factors that contribute to the final selection of a remedy are the scoping of response actions, the development of alternatives, and the detailed analysis of alternatives during the RI/FS. *To be consistent with the NCP for the purposes of cost recovery under section 107 of CERCLA, non-Fund-financed responses must, as appropriate, address the full range of alternatives outlined in § 300.-68(f), as well as comply with all other provisions of §§ 300.66(e) through (i).* Such responses also must provide an opportunity for appropriate public comment. This public involvement must be consistent with § 300.67(d) unless compliance with the legally applicable or relevant and appropriate State and local requirements identified in § 300.71(a)(4) provide a substantially equivalent opportunity for public involvement in the choice of remedy. *Finally, such responses must also comply with all otherwise applicable or relevant*

*and appropriate Federal, State, and local requirements.*

50 Fed.Reg. 47,935 (1985) (emphasis supplied). By the express language of the regulations, consistency with the NCP is an absolute requirement for cost recovery under a CERCLA action. The irresistible and necessary conclusion, therefore, is that the NCP was established to create standards by which aggrieved parties could commence cleanup. The purpose of establishing such standards is apparent: complainants may rely on Government determination and aid in deciding on the appropriate remedy in abating and curing environmental hazards. Implementing cleanup activities pursuant to Government authorization provides for concerted effort, which, in turn, leads to consistent results. CERCLA plaintiffs may rest secure in the knowledge that their actions have been endorsed and approved by the Government. CERCLA defendants also enjoy a degree of certainty when cleanup is executed with Governmental approval—defendants will not be subjected to overzealous "fishing expeditions" in the hopes of finding a deep pocket to cure every conceivable type of environmental ill. Important constitutional concerns, such as fair warning, notice, and void-for-vagueness concepts, safeguard CERCLA defendants from complainants attempting to prosecute meretricious claims. Thus, apart from being plainly required by the statutory language, consistency with the NCP also speaks to larger issues. Accordingly, failure to plead and prove such consistency is fatal to a private-action CERCLA claim.

The decisional law identically reflects the EPA's pronouncements that consistency with the NCP is a requisite element in establishing a *prima facie* claim under CERCLA. Thus, the courts have held that private parties seeking to recover response costs under § 9607 must comply with the NCP; and the parties' response actions will be measured against the criteria established under the Plan. The following excerpts from the cases are typically illustrative:

> The distinction between remedial and removal actions is crucial in certain cases where the failure to fulfill the more detailed procedural and substantive provi-

sions of the NCP with regard to 'remedial' actions becomes a barrier to recovery of response costs.

> . . . .

> I find that the defendants have failed to prove ... that the remedial actions taken in response to the contamination of the site were consistent with the NCP and cost-effective at the time the response costs were incurred and contribution for these remedial costs are disallowed.

*Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563, 1576, 1582 (E.D.Pa.1988).

> Similarly, the *Artesian* court held:

> Congress plainly contemplated that the NCP would be a standard against which response actions would be judged appropriate or inappropriate in the first instance, not merely a limit on the amount of damages recoverable from liable parties. I therefore hold that consistency with the NCP is an element of [plaintiff's] *prima facie* case under CERCLA.

*Artesian Water Co.,* 659 F.Supp. at 1291–92.

In a similar vein is *United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 747 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987):

> In comparison, CERCLA § 9607(a)(4)(B), provides "any other person," referring to any "person" other than the federal Government or a state, can recover "any other necessary costs of response ... consistent with the [NCP]." That statutory language indicates that non[-]Governmental entities must prove that their response costs are consistent with the NCP in order to recover them.

Indeed, the caselaw is rife with such examples. *See County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1512 (10th Cir.1991) ("Proof of response costs incurred 'consistent with' the NCP is, therefore, an element of a *prima facie* private cost recovery action under CERCLA. Because the [plaintiffs] have incurred no costs consistent with the NCP, CERCLA provides them no remedy."); *Amoco Oil Co.,* 889 F.2d at 672 ("Under CERCLA a private plaintiff may recover only those response costs that are necessary

and consistent with the NCP."); *Ambrogi*, 750 F.Supp. at 1253 ("This court finds that by the language of the statute, as well as the caselaw interpreting the same, consistency with the NCP is part of what constitutes a 'response cost.' Thus, by its very nature, it is an element of a plaintiff's *prima facie* case under a private party recovery action. Consistency must be pled with appropriate specificity as outlined in *McGregor* . . ."); *Channel Master*, 748 F.Supp. at 381 ("[T]he plaintiff bears the burden of proof to establish, as an essential element for recovery that, *inter alia*, the response costs for which it seeks compensation were 'consistent' with the NCP."); *Amland Properties Corp.*, 711 F.Supp. at 796–97 ("Certainly, the EPA's interpretation of the NCP and the caselaw deferring to that interpretation support my holding that private party responses to releases or threatened releases of hazardous substances are consistent with the NCP if they adhere to the specific requirements of the NCP. . . . [Plaintiff] must . . . comply with the requirements of the NCP in order to recover its response costs."). Accordingly, this court holds that consistency with the NCP is a requisite to prevailing on a private CERCLA action.

■ Once consistency with the NCP is determined to be an element of the plaintiff's *prima facie* case, the next issue to be addressed is the *degree* of consistency required to succeed on a private CERCLA claim. On this issue, the courts are split. A majority of courts have held that based on the language of 42 U.S.C. § 9607 and the EPA's own pronouncements, 50 Fed.Reg. 47,934–35 (1985), "strict compliance" with the NCP is required. For example, in *Amland Properties Corp.*, 711 F.Supp. at 796, the court held that "the requirements of the NCP must be adhered to in order to permit a private party to recover its response costs, unless the party seeking recovery explains why a specific requirement is not appropriate to the specific site and problem." *See also Channel Master*, 748 F.Supp. at 383–84; *Amland Properties Corp.*, 711 F.Supp. at 796–97; *Versatile Metals, Inc.*, 693 F.Supp. at 1579–83; *Artesian Water Co.*, 659 F.Supp. at 1291–92. Conversely, a single panel of the Ninth Circuit adopted a standard of "substantial com-

pliance." *See Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 891–92 (9th Cir. 1986); *NL Indus. v. Kaplan*, 792 F.2d 896, 898–99 (9th Cir.1986) (same panel delivering both opinions). This "substantial compliance" standard has not been followed. Indeed, other courts have stressed that *Wickland* and *Kaplan*, while using unusually broad language, are specifically narrow in application. *See County Line Inv.*, 933 F.2d at 1514; *Channel Master*, 748 F.Supp. at 383–84 (both holding that the Ninth Circuit rulings are "tied to narrow facts" and are "*not* broad holdings." (emphasis in original)).

In an attempt to reconcile the caselaw, the EPA revised the 1985 NCP as far as determining the consistency provisions a private party's response actions must meet. Thus, in 1990, the EPA declared that "[a] private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements." 40 C.F.R. § 300.700(c)(3)(i) (1990). The EPA has apparently lessened the strictures demanded for consistency with the NCP.

The "strict" *versus* "substantial" distinction, however, is largely obviated in the present action. Indeed, the court need not decide this issue since the result in the instant case would be identical under either standard. The Plaintiffs have not shown consistency with either strict or substantial compliance. As discussed above, the Plaintiffs have not demonstrated that their response rose to the level of being either a removal or remedial action. Also, the Plaintiffs failed to evince that their response, whatever it may have been, was necessary. Therefore, regardless of the quantum of compliance necessary for consistency with the NCP, the Plaintiffs have not satisfied either.

Concluding that consistency with the NCP is required under CERCLA, the court now examines the requirements for compliance. These requirements are enunciated, as discussed above, at 40 C.F.R. § 300.71(a)(2)(ii), for remedial actions, and 40 C.F.R. § 300.-65(b)(2) for removal actions. The Plaintiffs completely failed to satisfy either of these regulatory requirements. To repeat briefly,

the Plaintiffs offered no evidence that their response was consistent with either a removal or remedial action. Equally, the Plaintiffs made no effort to notify the EPA or state authorities regarding their proposed cleanup. Procedurally, the Plaintiffs made only vague and conclusory allegations as to "investigative costs," but never averred or demonstrated what these costs encompassed or under what authority they were executed. The Plaintiffs did not demonstrate that there were immediate threats to the population or food chains, nor do the Plaintiffs use the allegedly contaminated water for drinking purposes. Significantly, the Plaintiffs did not seek aid from any federal or state Governmental agencies as to the fashion in which to proceed in attempting cleanup. Indeed, the evidence of the Phase reports concluded that no remediation of the site was necessary. Even if the Plaintiffs did incur necessary response costs, they have not demonstrated that such response costs complied with the NCP. Accordingly, the Plaintiffs have not demonstrated that their response was consistent with the NCP. Failing to demonstrate the requisite consistency of their response with the NCP, the Plaintiffs have likewise failed in establishing the final element necessary to prevail on a CERCLA claim.

## D. *The Summary Judgment Standard*

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of such a material fact is "genuine" if the evidence so offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257, 106 S.Ct. at 2514. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324, 106 S.Ct. at 2553. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

Summary judgment serves the useful purpose of disposing of meretricious, pretended claims before the court and parties become entrenched in frivolous litigation. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987). Moreover, although summary judgment is a more extreme remedy, the courts should not be reluctant to grant summary judgment in appropriate cases; indeed, summary judgment is mandated where appropriate. *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *United States v. Porter*, 581 F.2d 698, 703 (8th Cir.1978); *Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 134 (S.D.N.Y.1989); *Burleson v. Illinois Farmers Ins.*, 725 F.Supp. 1489, 1490 (S.D.Ind.1989). In a recent trilogy of decisions—*Celotex Corp. v. Catrett*, 477 U.S. 317,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)—the Supreme Court has consistently reaffirmed its endorsement of pretrial resolution and summary disposition of baseless actions. These decisions reflect the mandatory nature of Rule 56. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court held:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555 (citations and internal quotation marks omitted).

With these propositions in mind, the court now analyzes CERCLA against the summary judgment standard. In *Channel Master*, a private-action CERCLA plaintiff had not complied with the NCP, an essential element of a CERCLA claim, and therefore could not recover response costs. In an attempt to survive the defendant's summary judgment motion, the plaintiff urged that the NCP not be viewed as a "regulatory obstacle course." 748 F.Supp. at 394. Rejecting the plaintiff's plea and granting summary judgment in favor of the defendant, the court held:

> The court does not regard the NCP as [a regulatory obstacle course]. The court simply believes that, since plaintiff seeks recovery under the CERCLA statute, plaintiff is required to comply with the specific requirements of that statutory claim, as set forth in the regulations and caselaw.... [Plaintiff] urges this court to delay ruling on defendants' motion for par-

> tial summary judgment on the grounds that the RI/FS now under way at the ... site might turn up additional evidence which plaintiff did not consider when making its decisions, but which might now justify those decisions. The court finds this argument to be without merit.

*Id.* at 394–95. Thus, once a private-action CERCLA plaintiff has failed to meet a *prima facie* element of its action, summary judgment is properly and immediately granted.

The Plaintiffs in the present case urge that "[b]oth the Plaintiffs and Defendant should at least admit that the law regarding the issue of consistency of response costs with the NCP is unclear." (Plaintiffs' "Surreply To Defendant's Partial Motion for Summary Judgment," at 9). In this regard, the Plaintiffs apparently attempt to stave off the County's Motion for Summary Judgment, claiming that a triable issue exists as to compliance with the NCP. The decisional law reveals, however, that CERCLA claims are properly resolved by summary judgment. Moreover, as a substantive matter, the law *is clear* that consistency with the NCP is an essential and mandatory element in a private-action CERCLA claim. Where affidavits, memoranda, depositions, and reports exist, as here, there is a sufficient factual record on which to base a summary judgment motion. Given this record, "[t]he question is therefore ripe for adjudication on the parties' cross motions for summary judgment." *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. at 1292–93; *see also County Line Inv. v. Tinney*, 933 F.2d 1508 (10th Cir.1991); *Ambrogi v. Gould, Inc.*, 750 F.Supp. 1233 (M.D.Pa.1990); *Channel Master Satellite v. JFD Elec. Corp.*, 748 F.Supp. 373 (E.D.N.C.1990); and *Versatile Metals, Inc. v. Union Corp.*, 693 F.Supp. 1563 (E.D.Pa.1988) (granting summary judgment to defendants where a private-action CERCLA plaintiff had not proved an essential element of a CERCLA claim). Accordingly, a CERCLA plaintiff must allege and demonstrate in and beyond his pleadings that his response was either a removal or remedial action which caused him to incur necessary response costs consistent with the NCP. Failure to present specific, material facts of

this tenor in the wake of a summary judgment motion by the opposing party proves absolutely fatal to a private action under CERCLA. Even under the Ninth Circuit's view of pleading and establishing a CERCLA cause of action, that court has held:

> Requiring a CERCLA claimant to plead a cognizable response will assist in the proper processing of these actions. There has been extensive litigation over which types of response costs are recoverable in a section [42 U.S.C. § 9607(a)] action.... Without passing on what precisely qualifies as a 'response cost' under CERCLA, we observe that if a plaintiff ultimately fails to show a proper response cost, then he will fail to prove his *prima facie* case. It therefore makes sense to impose as a pleading requirement that a claimant must allege at least one type of response cost cognizable under CERCLA in order to make out a *prima facie* case.

*Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1154 (9th Cir.1989). Similarly, in affirming the district court's dismissal of a private plaintiff's CERCLA action for failure to state a claim upon which relief could be granted, the Sixth Circuit held:

> [I]mplicit in the [Federal Rules of Civil Procedure] is ... the notion that the rules do contemplate a statement of circumstances, occurrences, and events in support of the claim being presented. In the instant case, plaintiffs failed completely to allege in their complaints either the costs they incurred or, at minimum, the actions they took in response to the allegedly hazardous conditions at the Industrial Excess Landfill.... But when a plaintiff ... supplies facts to support his claim, we do not think that *Conley* imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim into a substantial one.... In the instant case, plaintiffs ... failed to allege any similar factual basis for their conclusory allegations that they had personally incurred response costs consistent with the National Contingency Plan. The district court was not, therefore, required to presume facts that would turn plaintiffs' apparently frivolous

claim under Section [42 U.S.C. § 9607] of CERCLA into a substantial one.

*McGregor v. Industrial Excess Landfill, Inc.*, 856 F.2d 39, 42–43 (6th Cir.1988) (citations omitted).

Applying these standards to the instant action, summary judgment is properly granted in favor of the County. The Plaintiffs have failed in their procedural burden to demonstrate and evince to the court that their pleadings, memoranda, and actions have brought them within the ambit of a private-action CERCLA claim. The Plaintiffs have not demonstrated the existence of specific and material facts to stave off the County's Motion for Summary Judgment. Moreover, the courts, without violating the spirit of CERCLA, have concluded that the Act cannot operate in a vacuum and have therefore granted summary judgment when all elements of a CERCLA claim have not been fully and completely satisfied. The Federal Rules of Civil Procedure are an instrumental tool in orchestrating litigation through the courts, and nothing in CERCLA suggests that the Rules be subordinated to the Act. Therefore, the County's Motion for Partial Summary Judgment as to the CERCLA cause of action is hereby **GRANTED.**

As previously stated, the only basis of federal jurisdiction is the CERCLA claim. The Plaintiffs' declaratory judgment action does not serve as an independent basis of jurisdiction, and therefore, like the CERCLA action, it likewise fails.

### E. *State Law Claims*

■ The remaining causes of action are matters of pure state law. These claims were in this court only by virtue of pendant jurisdiction. Having concluded that the County is entitled to judgment as a matter of law pursuant to Fed.R.Civ.P. 56(c) on the federal cause of action, the state claims must now be addressed. In light of recent Fourth Circuit decisions, the court declines to exercise jurisdiction over the state claims and therefore dismisses them without prejudice. In *Mitcheson v. Harris*, 955 F.2d 235 (4th Cir.1992), an insurer prosecuted a declaratory judgment action in the federal court, seeking a declaration that it had no duty to

defend its insured, while the same litigation was concurrently pending in the state court. The district court ruled on the merits of the action; but the Fourth Circuit reversed, holding that these issues presented matters of state law and that the declaratory complaint was merely a vehicle for invoking federal jurisdiction. *Id.* at 236. The Fourth Circuit concluded that since the questions at issue hinged on state law, the state courts were the proper fora to resolve the matter. The Fourth Circuit premised its holding on two concerns:

> The first concern supporting dismissal of the declaratory action is the state's interest in deciding questions of state law—an interest that not surprisingly has its jurisprudential roots in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188] (1938).... There exists an interest in having the most authoritative voice speak on the meaning of applicable law, and that voice belongs to the state courts when state law controls the resolution of the case.... [T]he Supreme Court has recognized the desirability of having state courts interpret questions of state law.
>
> ....
>
> The second state interest favoring dismissal of the declaratory action is that of resolving all litigation stemming from a single controversy in a single court system.... [There] is the interest in promoting comity between federal and state courts. An important element of fostering that spirit of cooperation and respect must be a reluctance on the part of federal courts to entertain a declaratory action....

*Id.* at 237–239 (citations omitted). Accordingly, the state claims are dismissed, but without prejudice.

## IV. *CONCLUSION*

Concluding that the Plaintiffs have not satisfied each and every *prima facie* element of their CERCLA cause of action, the County is entitled to summary judgment on the CERCLA claim. Furthermore, because the declaratory judgment action does not serve as an independent basis of subject matter jurisdiction, that claim is now moot. Since the Plaintiffs have failed on their CERCLA claim, this court is deprived of federal jurisdiction because the remainder of the causes of action are matters of pure state law and are appropriately addressed by the state courts. With respect to these state claims, the court expresses no opinion; and the Amended Complaint is therefore dismissed without prejudice as to the remaining causes of action.

**THEREFORE, IT IS ORDERED** that the Defendant's Motion for Summary Judgment on the CERCLA claim be **GRANTED,** and

**IT IS FURTHER ORDERED** that the remaining causes of action asserted by the Plaintiffs be dismissed without prejudice.

**IT IS SO ORDERED.**